## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY and STATE FARM FIRE AND CASUALTY COMPANY,<br><br>        Plaintiffs,<br><br>                v.<br><br>DELAWARE DIAGNOSTIC & REHABILITATION CENTER, P.A.; CONRAD K. KING, JR., M.D., P.A.; DAMON D. CARY, D.O., P.A.; WILLIAM R. ATKINS, JR., M.D., LLC; CONRAD K. KING, JR.; DAMON D. CARY; and WILLIAM R. ATKINS, JR.,<br><br>        Defendants. | Civil Action No. _____<br><br>JURY TRIAL DEMANDED |

## COMPLAINT

Plaintiffs State Farm Mutual Automobile Insurance Company ("State Farm Mutual") and State Farm Fire and Casualty Company ("State Farm Fire") bring this complaint against Delaware Diagnostic & Rehabilitation Center, P.A., Conrad K. King, Jr., M.D., P.A., Damon D. Cary, D.O., P.A., William R. Atkins, Jr., M.D., LLC, Conrad K. King, Jr., M.D., Damon D. Cary, D.O., and William R. Atkins, Jr., M.D. (collectively "Defendants"), and allege as follows:

### Nature of the Case

1.      This action seeks to recover money fraudulently and unlawfully obtained from State Farm Mutual and State Farm Fire by Defendants through a scheme to obtain patients' no-fault insurance benefits by delivering medical services that were not tailored to the individualized complaints and needs of the patients and Defendants' false representations about their services.

ME1 28566859v.2

2.     Defendants are all healthcare providers who treated – and continue to treat – patients who were involved in automobile accidents and who were or are insured by State Farm Mutual or State Farm Fire ("State Farm Insureds").

3.     In general, the State Farm Insureds began treatment with Defendants shortly after an automobile accident for relatively minor injuries. Almost all of the insureds involved in this case were diagnosed with some type of "sprain" or "strain" of at least one of the cervical, thoracic or lumbar regions of the back.

4.     The vast majority of State Farm Insureds (more than 90%) also received prescriptions for opioid pain medications, such as oxycodone, hydrocodone or codeine. Although these types of medication should be reserved for significant and debilitating pain, Defendants routinely and repeatedly prescribed them for minor "sprains" and "strains."

5.     Opioid medications, like those prescribed by the Defendants, pose a significant risk of addiction and abuse. Consequently, medical professionals must employ safeguards to prevent misuse or diversion of opioids. Defendants, however, did not employ those safeguards. To streamline their operations to obtain insurance benefits, Defendants largely neglected to use even the most basic safeguards such as checking the Delaware Prescription Monitoring Program, utilizing treatment agreements, performing pill counts, and requiring periodic drug testing.

6.     Indeed, rather than protecting their patients from the dangers of opioids, Defendants capitalized on the addictive nature of opioids and the fact that opioid prescriptions generally could be written for a 31-day supply. Defendants used opioid prescriptions to induce patients to repeatedly return to Defendants for unreasonable and unnecessary treatment, which Defendants billed to State Farm Mutual and State Farm Fire.

7.     Defendants also prescribed an initial round of "physical therapy" for most patients (more than 80%). These treatments usually consisted primarily of passive treatments rendered by clinic staff who were not licensed physical therapists and which treatments were not designed to improve each patient's individual injuries, but to increase Defendants' billings.

2

8.     As a result of Defendants' conduct: (a) patients were not legitimately and appropriately treated for conditions they may have had; (b) patients were subjected to physical therapy treatments and received unnecessary medications; and (c) patients' limited insurance benefits were substantially reduced and, therefore, were not available for any legitimate medical treatment the patients may have needed.

9.     From January 2016 through August 2018, Defendants treated 240 State Farm Insureds[1] and billed State Farm Mutual or State Farm Fire for the services allegedly provided to those insureds.

10.     Through their fraudulent and unlawful scheme, Defendants obtained combined insurance benefits payments from State Farm Mutual and State Farm Fire in excess of $1.1 million.

11.     In this action, State Farm Mutual and State Farm Fire seek to recover their payments to Defendants through common law claims for fraud, unjust enrichment, and civil conspiracy.  State Farm Mutual and State Farm Fire also seek a declaratory judgment confirming that they are not obligated to pay any of Defendants' unpaid bills, invoices or demands because Defendants' services were fraudulent, unnecessary, and unlawful.

## Jurisdiction and Venue

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the action is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to State Farm Mutual and State Farm Fire's claims occurred in this judicial district.

---

[1] Some of these 240 State Farm Insureds were involved in more than one automobile accident and treated with Defendants after each accident.  Defendants submitted bills in connection with a total of 193 unique patient claims.

ME1 28566859v.2

**Parties**

14.     Plaintiff State Farm Mutual is an Illinois property and casualty insurer incorporated under the laws of Illinois with its principal place of business in Bloomington, Illinois.  State Farm Mutual is qualified to conduct business in Delaware.

15.     Plaintiff State Farm Fire is an Illinois property and casualty insurer incorporated under the laws of Illinois with its principal place of business in Bloomington, Illinois.  State Farm Fire is qualified to conduct business in Delaware.

16.     State Farm Mutual and State Farm Fire issue automobile insurance policies in Delaware, which provide insurance coverage for, among other things, reasonable and necessary expenses for medical, hospital, dental, surgical, medicine, x-ray, and ambulance services for injuries resulting from automobile accidents.

17.     Defendant Conrad K. King, Jr., M.D. ("Dr. King") is a citizen of Delaware who at all times relevant to this action resided in Wilmington, Delaware.  Dr. King is licensed to practice medicine in Delaware and is registered to prescribe controlled substances.   Dr. King claims to specialize in pain management.

18.     Defendant Damon D. Cary, D.O. ("Dr. Cary") is a citizen of Pennsylvania who resides in Philadelphia, Pennsylvania.  At all times relevant to this action, Dr. Cary practiced medicine and treated State Farm Insureds in Wilmington, Delaware and Newark, Delaware.  Dr. Cary is licensed to practice medicine in Delaware and is registered to prescribe controlled substances.  Dr. Cary claims to specialize in pain management.

19.     Defendant William R. Atkins, Jr., M.D. ("Dr. Atkins") is a citizen of Delaware who at all times relevant to this action resided in Wilmington, Delaware.  Dr. Atkins is licensed to practice medicine in Delaware and is registered to prescribe controlled substances.  Dr. Atkins claims to specialize in pain management.

20.     Dr. King, Dr. Cary, and Dr. Atkins are collectively referred to as "the Doctors."

21.     Defendant Delaware Diagnostic & Rehabilitation Center, P.A. ("Delaware Diagnostic") is a Delaware professional association with its principal place of business at 1700

Wawaset Street, Suite 100, Wilmington, Delaware 19806.  Dr. King and Dr. Atkins own or owned Delaware Diagnostic.  Dr. King and Dr. Atkins treat patients at Delaware Diagnostic.

22.     Defendant Conrad K. King, Jr., M.D., P.A. ("King Practice") is a Delaware professional association with its principal place of business at 1400 Peoples Plaza, Suite 233, Newark, Delaware 19702.  Dr. King owns the King Practice.  Dr. King and Dr. Cary treat patients at the King Practice.

23.     Defendant Damon D. Cary, D.O., P.A. ("Cary Practice") is a Delaware professional association with its principal place of business at 305 North Union Street, Suite 110, Wilmington, Delaware 19805.  Dr. Cary owns the Cary Practice and treats patients there along with Dr. King.

24.     Defendant William R. Atkins, Jr., M.D., LLC ("Atkins Practice") is a Delaware limited liability company with its principal place of business at 550 Stanton Christiana Road, Suite 201, Newark, Delaware 19713.  Dr. Atkins owns the Atkins Practice and treats patients there.

25.     Delaware Diagnostic, King Practice, Cary Practice, and Atkins Practice are collectively referred to as "the Clinics."

### Delaware Motor Vehicle Insurance Coverage

26.     State Farm Mutual and State Farm Fire issue motor vehicle insurance policies in Delaware.

27.     Under Delaware law, motor vehicle owners are required to purchase minimum insurance coverages including coverage to compensate injured persons in the covered driver's motor vehicle regardless of whether the vehicle's driver was at fault in causing the accident. This coverage is commonly called personal injury protection insurance or no-fault insurance.

28.     The no-fault coverage must provide "[c]ompensation to injured persons for reasonable and necessary expenses incurred within 2 years from the date of the accident." *See* Del. Code Ann. tit. 21, § 2118(a)(2).  The coverage includes reasonable and necessary medical services expenses and certain other specified expenses. *See id.*

ME1 28566859v.2

29.     Pursuant to Delaware law and the terms of their insurance policies, State Farm Mutual and State Farm Fire are obligated to pay medical expenses only if they are reasonable, necessary, and related to an injury caused by the accident.

30.     The statutory minimum amount of no-fault insurance coverage is $15,000 for one person and $30,000 for all persons injured in any one accident. *See* Del. Code Ann. tit. 21, § 2118(a)(2).  The minimum coverage amount is subject to any deductibles and percentage reductions as provided in the applicable policy. *See id.*

31.     An insured can assign his or her right to no-fault insurance benefits to a medical provider in exchange for medical services to treat the insured's injuries resulting from the accident.  A properly executed assignment of benefits allows a medical provider to submit claims directly to automobile insurance companies and receive payment directly from the insurance company for necessary medical services.

32.     Here, Defendants submitted bills and medical records directly to State Farm Mutual and State Farm Fire to support Defendants' claims for payment of no-fault insurance benefits.   Defendants' submission of bills for payment constituted a representation that the medical services were: (a) for injuries resulting from the automobile accident; (b) reasonable; and (c) necessary.

### Delaware's Regulation of Opioid Prescriptions

33.     The prescription medications at issue in this case (for example, oxycodone, hydrocodone or codeine) are designated Schedule II or Schedule III controlled substances under federal and state law.  *See* 21 C.F.R. §§ 1306.12(a) and 1308.13; *see also* Del. Code Ann. tit. 16, §§ 4718 and 4739(b).

34.     A Schedule II controlled substance is a drug that has an accepted medical use, but which has high potential for abuse that may lead to severe psychological or physical dependence. *See* 21 U.S.C. § 812(b); Del. Code Ann. tit. 16, § 4715.

ME1 28566859v.2

35.     A Schedule III controlled substance is a drug that has an accepted medical use, but has a lower potential for abuse and may lead to moderate or low physical dependence or high psychological dependence.  *See* 21 U.S.C. § 812(b); Del. Code Ann. tit. 16, § 4717.

36.     Doctors may not prescribe refills for Schedule II controlled substances, including opioids, but rather must issue a new and separate prescription for Schedule II controlled substances.  *See* 21 C.F.R. § 1306.12(a); Del. Code Ann. tit. 16, § 4739(b).

37.     In Delaware, a physician can only write a prescription for a Schedule II or Schedule III controlled substance for 100 dosage units or a 31-day supply, whichever is greater. 24 Del. Admin. Code CSA § 4.7.1.

**Delaware's Efforts to Curb Opioid Misuse and Diversion**

38.     In 2013, the Delaware Prescription Drug Action Committee noted that "[o]ver the last two decades, the drug overdose mortality rate has accelerated rapidly both nationwide and in Delaware. The overwhelming majority of the drug overdose mortality deaths have been caused by prescription drug abuse and misuse, underlined particularly in the opioid pain reliever category."[2]

39.     In fact, almost two million Americans abused or were dependent on prescription opioids in 2014.[3] The Centers for Disease Control and Prevention ("the CDC") reports that as many as one in four people who receive prescription opioids for non-cancer pain in primary care settings struggles with addiction.[4]

40.     Opioids are not only addictive, but can be lethal. According to the CDC, more people died from drug overdoses in 2016 than in any prior year on record and more than six out

---

[2] Substance Abuse and Mental Health Services Administration, National Survey on Drug Use and Health, 2014 *available at* http://www.samhsa.gov/data/sites/default/files/2014_National_Survey_of_Substance_Abuse_Treatment Services/2014_National_Survey_of_Substance_Abuse_Treatment_Services/2014_National_Survey_of_Substance_Abuse_Treatment_Services.pdf (emphasis added).

[3] Substance Abuse and Mental Health Services Administration, National Survey on Drug Use and Health, 2014 *available at* http://www.samhsa.gov/data/sites/default/files/2014_National_Survey_of_Substance_Abuse_Treatment Services/2014_National_Survey_of_Substance_Abuse_Treatment_Services/2014_National_Survey_of_Substance_Abuse_Treatment_Services.pdf.

[4] CDC, "Injury Prevention & Control: Opioid Overdose," *available at* https://www.cdc.gov/drugoverdose/data/overdose.html.

ME1 28566859v.2

of ten drug overdose deaths involved an opioid.[5]  From 1999 to 2016, more than 350,000 people in the United States died from overdoses related to opioids.[6]  In 2014 alone, 189 people died in Delaware from drug overdoses.

41.  On July 15, 2010, Delaware implemented a prescription drug monitoring program.  The program requires a prescriber of a Schedule II controlled substance (which includes nearly all opioids) to first obtain "a patient utilization report regarding the patient for the preceding 12 months from the computerized program established by the office of controlled substances when the prescriber has a reasonable belief that the patient may be seeking the controlled substance, in whole or in part for any reason other than the treatment of an existing medical condition.  The prescriber shall review the patient utilization report to assess whether the prescription for the controlled substance is necessary."  Del. Code Ann. tit. 2, § 4798 (e).

42.  Pain management specialists generally agree that it is appropriate and part of the general standard of care to periodically verify a patient's prescription history via a prescription monitoring program any time opioid pain medications are prescribed for an extended period of time.

43.  In 2011, the Delaware Board of Medical Licensure and Discipline adopted the Federation of State Medical Boards' Model Policy for the Use of Controlled Substances for Treatment of Pain ("the Model Policy").  *See* 24 Del. Admin. Code § 1700.18.0 *et seq.*  The Model Policy was "developed to define specific requirements applicable to pain control, particularly related to the use of controlled substances, to alleviate licensed practitioners' uncertainty to encourage better pain management, and to minimize practices that deviate from

---

[5] Rudd et al., "Increases in Drug and Opioid Overdose Deaths – United States, 2000-2014," Morbidity and Mortality Weekly Report (MMWR) (Jan. 1, 2016), *available at* http://www.cdc.gov/mmwr/preview/mmwrhtml/mm6450a3.htm?s_cid=mm6450a3_w; Scholl et al., "Overdose Deaths Involving Opioids, Cocaine, and Psychostimulants – United States, 2015-2016," Morbidity and Mortality Weekly Report (MMWR) (Mar. 30, 2018), *available at https://www.cdc.gov/mmwr/volumes/67/wr/mm6712a1.htm*.
[6] *See* Dowell et al., "CDC Guidelines for Prescribing Opioids for Chronic Pain – United States, 2016," Morbidity and Mortality Weekly Report (MMWR) (Mar. 18, 2016), *available at* https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm; Scholl et al., "Overdose Deaths Involving Opioids, Cocaine, and Psychostimulants – United States, 2015-2016," Morbidity and Mortality Weekly Report (MMWR) (Mar. 30, 2018), *available at https://www.cdc.gov/mmwr/volumes/67/wr/mm6712a1.htm.*

ME1 28566859v.2

the appropriate standard of care and lead to abuse and diversion."  24 Del. Admin. Code §
1700.18.0.

44.    The Board explicitly recognized that "the use of opioid analgesics for other than
legitimate medical purposes can pose a threat to the individual and society and that the
inappropriate prescribing of controlled substances, including opioid analgesics, may lead to drug
diversion and abuse by individuals who seek them for other than legitimate medical use.
Accordingly, these regulations mandate that licensed practitioners incorporate safeguards into
their practices to minimize the potential for the abuse and diversion of controlled substances."
24 Del. Admin. Code § 1700.18.0.

45.    Delaware regulations further provide that "[a]t a minimum, practitioners who
regularly treat patients for chronic pain must educate themselves about the current standards of
care applicable to those patients."  24 Del. Admin. Code § 1700.18.6.

46.    When evaluating the treatment of chronic pain, a "medical history and physical
examination <u>must</u> be obtained, evaluated, and documented in the medication record.   The
evaluation <u>must document</u>: [ ] etiology, the nature and intensity of the pain, current and past
treatments for pain, [ ] underlying or coexisting diseases or conditions, [ ] the effect of pain on
physical and psychological function, and history of substance abuse, [and] the presence of one or
more recognized medical indications for the use of a controlled substance."  24 Del. Admin.
Code § 1700.18.1 (emphasis added).  Further, these criteria "may be applicable to prescribing
controlled substances for the treatment of acute pain when clinically appropriate."  *Id.*

47.    When prescribing controlled substances for the treatment of pain, "[a] written
treatment plan <u>is required</u> and must state goal and objectives that will be used to determine
treatment success, such as pain relief and improved physical and psychological function, and
should indicate if any further diagnostic evaluations or other treatments are planned.  . . .  After
treatment begins, the practitioner must adjust drug therapy to the individual needs of each
patient."  24 Del. Admin. Code § 1700.18.2 (emphasis added).

48.    The doctor "<u>shall</u> periodically review the course of pain treatment and any new

information about the etiology of the pain or the patient's state of health.  Periodic review shall include, at a minimum, evaluation of the following: [ ] continuation or modification of controlled substances for pain management therapy depending on the practitioner's evaluation of the patient's progress toward treatment goals and objectives[;] satisfactory response to treatment as indicated by the patient's decreased pain, increased level of function, or improved quality of life . . .[;] if the patient's progress is unsatisfactory, the practitioner shall assess the appropriateness of continued use of the current treatment plan and consider the use of other therapeutic modalities." 24 Del. Admin. Code § 1700.18.5 (emphasis added).

49.     Medical practitioners are required to appropriately document each visit and must include, for each visit, "the interim history and physical examination, vital signs as clinically appropriate, assessment of progress, and medication plan." 24 Del. Admin. Code § 1700.18.8.

50.     Doctors who prescribe or dispense controlled substances are required to maintain a record of the name and address of the patient, the date the medication was prescribed, and the name, strength, amount of the medication and whether any refills are authorized.  24 Del. Admin. Code CSA § 6.1.2.

### Delaware's Regulations for Safe Prescribing of Opioid Analgesics

51.     On April 1, 2017, Delaware adopted new regulations governing the "Safe Prescribing of Opioid Analgesics," which included distinct guidelines to address the use of opioids to address acute pain and chronic pain.  *See* 24 Del. Admin. Code CSA § 9.0 *et seq*.

52.     As a threshold matter, each practitioner must be licensed in Delaware "and registered with the U.S. Drug Enforcement Administration and must comply with all applicable federal and state regulations."  *Id.* at § 9.2.

53.     The regulations define "acute pain" as the "normal predicted physiological response to a noxious chemical, thermal or mechanical stimulus and typically is associated with invasive procedures, trauma, and disease.  It is generally time limited.  For the purpose of this Regulation, Acute Pain is less than three months in duration."  *Id.* at § 9.3.2.

54.     Generally, a first time prescription for opioid analgesic cannot exceed a seven-day

supply. *Id.* at §§ 9.5.1 & 9.5.2. However, an opioid prescription longer than seven days may be issued if it is warranted "in the professional medical judgment of a practitioner . . . to treat [the] acute medical condition." *Id.* at § 9.5.3. In such circumstances, the practitioner must document the condition triggering the prescription in the patient's medical record, query the Prescription Monitoring Program to obtain a prescription history, indicate that a non-opiate alternative was not appropriate to address the medical condition, obtain an informed consent form signed by the patient, and schedule and undertake follow-up visits and evaluation to monitor and assess the patient's progress towards goals in the treatment plan and modify the plan as necessary. *Id.* at §§ 9.5.3, 9.6.4 and 9.6.5.

55.     After the initial prescription and prior to issuing a subsequent prescription, the practitioner must perform an appropriate evaluation of the patient's medical history and condition, which includes a query of the Prescription Monitoring Program for the first visit after the initial prescription, administer a fluid drug screen (at the discretion of the practitioner), conduct a physical examination which must include a discussion of the risks and benefits of opioid analgesics and possible alternatives to their use, obtain an informed consent form signed by the patient and schedule and undertake follow-up visits and evaluation to monitor and assess the patient's progress towards goals in the treatment plan and modify the plan as necessary. *Id.* at §§ 9.6-9.6.5.

56.     The Regulations explain that the informed consent must include at least information pertaining to:

(a)     the drug's potential for addiction, abuse and misuse,

(b)     the risks associated with the drug of life threatening respiratory depression,

(c)     the risks of overdose as a result of accidental exposure potentially fatal, especially in children; neonatal opioid withdrawal symptoms, and

(d)     a potentially fatal overdose when interacting with alcohol and other potentially fatal drug/drug interactions such as benzodiazepines.

ME1 28566859v.2

*Id.* at § 9.6.4.

57.     The Regulations define "Chronic Pain" as "a state in which pain persists beyond the usual course of an acute disease or healing of an injury or that may or may not be associated with an acute or chronic pathologic process that it causes continuous or intermittent pain over months or years.  For the purpose of this Regulation, Chronic Pain means continuous or nearly continuous pain more than three months in duration."  *Id.* at § 9.3.6.

58.     In order to prescribe opioids for chronic pain patients, a provider must comply with the requirements of subsection 9.6 and follow certain additional safeguards.  *See id.* at § 9.7.

59.     For chronic pain patients, a practitioner must query the Prescription Monitoring Program:

    (a)     at least every six months (more if clinically indicated),

    (b)     whenever the patient is also prescribed a benzodiazepine,

    (c)     if the patient is assessed to be at risk for substance abuse or misuse,

    (d)     if a patient demonstrates such things as loss of prescriptions, requests for early refills or similar behavior.

*Id.* at § 9.7.1 & 9.7.2.

60.     In addition, for chronic pain patients, the practitioner is to administer a fluid drug screen at least every six months, obtain a signed treatment agreement, conduct a risk assessment and document in the record alternative treatment options that have been tried by the patient and their adequacy in providing sufficient management of pain.

61.     Defendants did not comply with the foregoing standards and requirements under Delaware law in treating the State Farm Insureds.

**Defendants Engaged in Scheme Designed to Maximize Their Own Revenues**

62.     Defendants' medical services were neither reasonable nor necessary as a result of the automobile accident, but were furnished as a consequence of Defendants' unlawful and fraudulent scheme.  Instead of treating each State Farm insured based on his or her needs, the Defendants: prescribed large quantities of opioid pain relievers to most patients at their initial

ME1 28566859v.2

visits without using basic safeguards to ensure patients were not misusing or diverting the opioid medications; required patients to complete physical therapy treatment consisting primarily of passive modalities that were designed to increase Defendants' billings rather than improve patients' medical conditions; and directed patients to return for follow-up examinations every month and using the opioid prescriptions as an inducement to ensure that patients continued treating with Defendants for extended periods of time.

A.      *Opioid Prescriptions – Early Prescriptions and Repeated Renewals*

63.      First, the Doctors over-prescribed opioid pain medications and prescribed them at the earliest stages of treatment without utilizing or adopting appropriate safeguards.

64.      The CDC estimates that only 20% of patients presenting to physician offices with non-cancer pain symptoms or pain-related diagnoses (including acute and chronic pain) receive an opioid prescription.[7]

65.      More than 90% of State Farm Insureds received a prescription for opioids during their treatment with Defendants.  (*See* Exhibit 1, Exam Treatment Summary.)

66.      The Doctors prescribed an opioid at more than 88% of initial visits for which medical records were received.  (*See* Exhibit 2, Initial Exam Summary.)

67.      The Doctors prescribed an opioid pain medication at over 80% of the more than 2,000 patient examination visits.  (*See* Exhibit 1, Exam Treatment Summary.)  Of the patient visits at which an opioid was prescribed, State Farm Mutual or State Farm Fire were billed by: Delaware Diagnostic for over 20% of patient visits; the Atkins Practice for approximately 4% of patient visits; the Cary Practice for over 45% of patient visits; and the King Practice for approximately of 25% patient visits.[8]  (*See* Exhibit 1, Exam Treatment Summary.)

68.      Even assuming an opioid was appropriate to treat acute pain after a minor automobile accident that resulted in various strains and sprains, repeated renewals of opioid

---

[7] *See* Dowell et al., "CDC Guidelines for Prescribing Opioids for Chronic Pain – United States, 2016," Morbidity and Mortality Weekly Report (MMWR) (Mar. 18, 2016), *available at* https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm.
[8]   There were forty-three (43) patient visits where the Provider ID information was not available.

prescriptions generally are not required for the vast majority of automobile accident patients. Defendants, however, repeatedly prescribed opioids for more than twelve months for many patients, including some patients under the age of 18.

69.     The Doctors directed the patients to return for a follow-up visit approximately every 30 days at which time the patients received a minimal evaluation and a renewal of their opioid prescription.

70.     By prescribing opioid pain medications to more than 90% of their patients, Defendants increased the likelihood the patients would return for monthly visits to obtain new prescriptions – which most of the patients did for extended periods of time.  Indeed, the average duration of treatment for State Farm Insureds after each accident was 252 days with 7.6 re-examination visits.  (*See* Exhibit 1, Exam Treatment Summary.)

71.     However, there is little support for the long-term use (i.e., use for more than three months) of opioids for reducing pain and improving function.[9]

72.     In issuing and re-issuing opioid prescriptions, Defendants' actions fell well below the standard of care and instead ensured that the patients would continue to seek renewals for inappropriate and dangerous opioid medications.

73.     Defendants failed to utilize the standard practices adopted by pain specialists – which they proclaim to be – throughout Delaware and across the country to increase the safety and effectiveness of prescribing opioids for non-cancer pain.

74.     As noted above, proper prescription documentation of the medication, strength, and dosage is necessary to correlate and evaluate the medication's therapeutic benefits and side effects and manage the patient's care.  However, the Doctors failed to appropriately document the medications they prescribed.  For example, on certain patients' records only the words "refill

---

[9] *See* Dowell et al., "CDC Guidelines for Prescribing Opioids for Chronic Pain – United States, 2016," Morbidity and Mortality Weekly Report (MMWR) (Mar. 18, 2016), *available at* https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm.

pain meds" were documented.  The name of the medication, strength, and dosage instructions were not indicated.  (*See* Exhibit 3A, 3B, 3C and 3D, Examples of Exam Medical Records.)

75.     Further, Delaware law requires a prescriber to obtain a report from the Prescription Monitoring Program reflecting a patient's prescription drug utilization if the prescriber has a reasonable belief the patient may be seeking the controlled substance for any reason other than treatment of an existing medical condition.  The Doctors routinely failed to comply with this requirement.  According to Defendants' medical records:

(a)     Dr. Cary did <u>not</u> check the Delaware Prescription Monitoring Program <u>a single time</u> during 752 patient exams of State Farm Insureds.  (*See* Exhibit 1, Exam Treatment Summary.)

(b)     There were 456 evaluations performed where the specific performing provider was not identified and the Delaware Prescription Monitoring Program was checked <u>only one time</u>.

(c)     Margaret Love, a physician's assistant, who performed 180 total evaluations for Dr. Cary's practice and Dr. King's Practice, did <u>not</u> check the Delaware Prescription Monitoring Program <u>a single time</u>.

(d)     Dr. Atkins checked the Delaware Prescription Monitoring Program 32 times (8%) during his 366 patient exams of State Farm Insureds.   (*See* Exhibit 1, Exam Treatment Summary.)

(e)     Dr. King checked the Delaware Prescription Monitoring Program 24 times (9.5%) during his 252 patient exams of State Farm Insureds.  (*See* Exhibit 1, Exam Treatment Summary.)

76.      One safeguard utilized by pain management doctors (which was later codified) is the use of a treatment agreement.  In the pain management context, a treatment agreement is a written agreement between the patient and his or her medical provider in which the patient agrees to certain terms and conditions of receiving addictive pain medications, including routine drug testing, how renewals of pain medications will be evaluated and handled, the reasons for

which pain medications may be discontinued, and a requirement that the patient receive prescriptions from only one licensed practitioner.  Defendants rarely entered into treatment agreements with their patients.

77.    Pill counts are another monitoring mechanism for doctors prescribing opioids where the doctors count the remaining opioid tablets during each patient visit for medication renewal to ensure patients are using the medication properly and make any appropriate adjustments to dosage, frequency or the number of pills provided.  Defendants' medical records reflect they performed a pill count on only 2 of 1776 evaluation visits where complete records were submitted.  (*See* Exhibit 1, Exam Treatment Summary.)

78.    Another standard practice is to perform routine drug testing which assists a provider in ensuring a patient's compliance with the prescribed opioid regime and to monitor the use of any non-prescribed or illicit substances.  Urine drug testing results aid in clinical decision-making with respect to continuation, discontinuation, or modification (for example, limiting the supply, selecting a drug with lower street value, requiring more frequent office visits, performing more frequent pill counts, consulting with a substance abuse specialist) of opioid therapy.  A minimum of one urine drug test per year should be performed on every patient who receives prescriptions for opioids on a long-term basis.

79.    Defendants purportedly ordered drug testing on State Farm Insureds at only 15% of the evaluation visits.  Moreover, Defendants only documented the drug test results in the medical records in only about half of those instances, which records were often inconsistent and incomplete because they failed to state the test results, explain why the patient was compliant (or non-compliant), and/or state whether any illicit substances were discovered.  (*See* Exhibit 1, Exam Treatment Summary.)

80.    For example, on at least six (6) occasions, Dr. Cary's patients tested positive for a non-prescribed drug and he noted that he would repeat the drug screening to rule out a potential false positive test result, but Dr. Cary did not repeat the drug test and continued to prescribe opioids to each patient.

16

81.     Defendants' failure to utilize or properly employ these standard practices not only exposed their patients to risk, but is demonstrative of their intent to tailor their treatment to obtain insurance benefits rather than promote their patients' recovery.

B.      *Physical Therapy Treatments*

82.     The Doctors prescribed, and the Clinics provided, physical therapy treatments consisting primarily of passive modalities for the first two to three months the State Farm Insureds treated with Defendants.

83.     For patients who have been in automobile accidents and who have complaints of pain, a detailed history and legitimate physical examination must be performed to arrive at a legitimate diagnosis and individualized treatment plan for each patient based on his or her specific medical condition and needs.  During the course of treatment, treatment plans should be modified based upon the unique circumstances of each patient and his or her response (or lack thereof) to the treatment.

84.     Legitimate treatment plans for patients with soft tissue injuries, strains, and sprains may involve no treatment at all because many of these kinds of injuries heal without any medical intervention, or they may involve a variety of interventions including medications to reduce inflammation and relieve pain, passive physical therapy modalities, and active physical therapy modalities.

85.     Passive physical therapy modalities do not require any affirmative effort or movement by patients.  There are many kinds of passive modalities including hot and cold packs, ultrasound, traction, manual therapy, therapeutic massage, and electrical stimulation.

86.     Active physical therapy modalities require patients to affirmatively participate in their treatment and include various kinds of stretching and strengthening exercises.

87.     In legitimate treatment plans following an accident, passive modalities typically are used only to the extent necessary to reduce pain and to facilitate the patient's ability to perform active modalities, which should be introduced into a patient's treatment plan as soon as practicable.

88.     Here, nearly every State Farm Insured received a diagnosis for a lumbar, thoracic, or cervical sprain (i.e., a sprain to one or more parts of the back).  This diagnosis was used to substantiate the purported need for physical therapy.  (*See* Exhibit 1, Exam Treatment Summary.)

89.     Patients suffer from a variety of ailments following car accidents including back sprains, however, diagnosing over 99% of automobile accident patients with a spinal sprain (stretching or tearing of the spinal ligaments) is simply not credible.

90.     After receiving the non-credible diagnoses of some sort of back sprain, the vast majority of State Farm Insureds were prescribed and received physical therapy treatments at the Clinics consisting overwhelmingly of passive treatment modalities administered by clinic staff. (*See* Exhibit 4, Patients Who Received Physical Therapy.)

91.     While one or more passive modalities may be appropriate on any particular visit to reduce pain and facilitate the patient's ability to perform active modalities, a combination of only passive modalities – hot packs, electrical stimulation, massage, and ultrasound – on nearly every visit regardless of whether the patient improved would rarely be appropriate for one such patient, let alone for almost every patient being treated on the vast majority of visits.

92.     Combined, the Defendants billed State Farm for more than 4,000 physical therapy visits for the State Farm Insureds who received physical therapy.  (*See* Exhibit 5, Physical Therapy Summary.)  Each patient received, on average, almost 21 physical therapy visits.  (*Id.*)

93.     Approximately 80% of the physical therapy visits did not involve a single active modality.  (*See* Exhibit 5, Physical Therapy Summary.)  Further, 98 patients never received an active modality at all through their course of treatment.  As discussed above, passive modalities should yield to active modalities as treatment continues and a patient's condition improves. Therefore, the fact that active modalities frequently were not introduced into treatment suggests the patient's condition was not improving.  Nevertheless, the Doctors did not change the course of therapy prescribed.

ME1 28566859v.2

94.     The physical therapy plans and treatments were not designed to help the patients' injuries heal, but were designed to provide additional revenue for Defendants with minimal work.

### State Farm's Reliance and Damages

95.     Defendants are obligated legally and ethically to act honestly and with integrity. The Delaware medical practice statute governs the conduct of medical and osteopathic doctors. Violations of the statute can result in disciplinary action against the doctor or prosecution by the attorney general.  Under the statute, unprofessional conduct expressly includes:

(a)     The use of any false, fraudulent, or forged statement or document or the use of any fraudulent, deceitful, dishonest, or unethical practice . . . in connection with the practice of medicine;

(b)     Any dishonorable, unethical, or other conduct likely to deceive, defraud, or harm the public;

(c)     The use, distribution, or issuance of a prescription for a dangerous or narcotic drug, other than for therapeutic or diagnostic purposes.

Del. Code Ann. tit. 24, § 1731(b).

96.     Further, the Delaware Administrative Code explains that dishonorable, unethical, or conduct likely to deceive, defraud, or harm the public includes:

(a)     "A pattern of performance of unnecessary medical procedures";

(b)     "Fraudulent billing for medical services"; and

(c)     "Failure to comply with the Board's regulations governing the use of controlled substances for the treatment of pain."

24 Del. Admin. Code §§ 1700.8.1.1, 1700.8.1.4, and 1700.8.1.12.

97.     Despite their duty to act honestly, by submitting the bills and supporting documentation, Defendants represented that they actually provided the services billed and that the services were reasonable, related to the automobile accident, and medically necessary.

98.     However, Defendants' bills and supporting documentation were false, misleading, and/or fraudulent because they did not reflect actual diagnoses or treatments that were reasonable or medically necessary.  Instead, the services were part of Defendants' predetermined treatment plan aimed at maximizing the financial benefit to Defendants without regard to the patients' individual needs.

99.     State Farm Mutual and State Farm Fire are under statutory and contractual obligations to promptly process claims within 30 days of receipt of a written request for payment of a claim for benefits.  *See* Del. Code Ann. tit. 21, § 2118B(c).  The bills and supporting documents that Defendants submitted to State Farm Mutual and State Farm Fire in support of the fraudulent charges at issue were designed to, and did, cause State Farm Mutual and State Farm Fire to justifiably and reasonably rely on them in processing payment for Defendants' services.

100.    As a result, State Farm Mutual incurred damages of almost $550,000 and State Farm Fire incurred damages of more than $600,000 based upon Defendants' fraudulent charges for services rendered from January 1, 2016 through the present.

101.    Based on Defendants' intentional misrepresentations to State Farm Mutual and State Farm Fire, State Farm Mutual and State Farm Fire did not discover and should not have reasonably discovered that their payments to Defendants were based on fraud until they reviewed the patterns reflected in the bills and supporting documentation Defendants submitted to State Farm Mutual and State Farm Fire which revealed the Defendants' predetermined treatment plan and improper opioid prescribing practices.

102.    Defendants fraudulently concealed their conduct by repeatedly submitting misleading bills and medical records that made it appear they were delivering legitimate medical care when considered in the context of a single patient's claim.  However, Defendants were not providing legitimate medical care designed to address their patients' actual injuries from automobile accidents.  Instead, they were indiscriminately prescribing opioid narcotics and physical therapy to the vast majority of patients who treated at the Clinics.  Only when State Farm Mutual and State Farm Fire reviewed all of the bills and patient records over an extended

time period as a whole did Defendants' wrongful conduct become apparent.  The submission of misleading bills and medical records were affirmative acts by Defendants that prevented State Farm from discovering the truth.

103.   State Farm Mutual's and State Farm Fire's injuries were inherently unknowable because State Farm Mutual and State Farm Fire believed they were paying what they owed. They processed and paid Defendants' fraudulent claims in the normal course of business and did not suspect, and had no reason to suspect, that Defendants were engaged in a fraudulent scheme designed to improperly and unlawfully extract insurance benefits from State Farm Mutual and State Farm Fire.

## **FIRST CLAIM FOR RELIEF**
### **(Common Law Fraud Against All Defendants)**

104.   State Farm Mutual and State Farm Fire incorporate, as if fully set forth herein, each and every allegation in paragraphs 1 through 103.

105.   Defendants Delaware Diagnostic, Atkins Practice, Cary Practice, King Practice, Dr. Atkins, Dr. Cary, and Dr. King intentionally and knowingly made false and misleading statements of material fact to State Farm Mutual and State Farm Fire by submitting, or causing to be submitted, bills and supporting documentation that contained false representations concerning patients treated at Delaware Diagnostic, Atkins Practice, Cary Practice, and King Practice by Drs. Atkins, Cary, and King.

106.   The false and misleading representations of material fact include representations that:

      (a)    Patients were legitimately examined to determine the true nature and extent of their injuries, when they were not;

      (b)    Patients were legitimately diagnosed with, among other things, sprains and strains of the cervical, thoracic, and/or lumbar regions of the spine, when they were not;

(c)     Patients were prescribed and received physical therapy treatments that were medically necessary, when in the fact the treatment was performed based on the predetermined treatment protocol and not based on an individualized assessment and evaluation of patients' medical needs;

(d)     Patients were prescribed and received opioid pain medications that were medically necessary, when in fact the medications were provided based on the predetermined treatment protocol as an inducement for patients to continue treating with Defendants;

(e)     Patients received numerous follow-up examinations that were medically necessary, when in fact the examinations were provided based on the predetermined treatment protocol and not based on an individualized assessment and evaluation of patients' medical needs.

107.    Dr. Atkins, Dr. Cary, Dr. King, Delaware Diagnostic, Atkins Practice, Cary Practice, and King Practice each knew the representations described in the paragraph above were false and misleading at the time they were made.  Defendants knew the treatments they provided were not medically necessary and that they were not legitimately evaluating, diagnosing, and treating the State Farm Insureds.

108.    Defendants' false and misleading statements of material fact include the representations in each claim identified Exhibits 6, 7, 8, and 9.

109.    Dr. Atkins, Dr. Cary, Dr. King, Delaware Diagnostic, Atkins Practice, Cary Practice, and King Practice each made the misrepresentations described above and engaged in such conduct to induce State Farm Mutual and State Farm Fire to rely on the misrepresentations and pay their bills for services rendered to State Farm Insureds.

110.    State Farm Mutual and State Farm Fire relied on Defendants' misrepresentations when they paid Defendants' bills.

111.    State Farm Mutual's and State Farm Fire's reliance was justifiable and reasonable because they did not know or have reason to know that Defendants' representations were false.

ME1 28566859v.2

112.    As a result of its reliance, State Farm Mutual incurred damages of almost $550,000.  State Farm Mutual paid the following amounts to each of the Clinics based on its reliance:

(a)    Delaware Diagnostic:  more than $170,000 (*see* Exhibit 6);

(b)    Atkins Practice: more than $75,000 (*see* Exhibit 7);

(c)    Cary Practice:  more than $190,000 (*see* Exhibit 8); and

(d)    King Practice:  more than $120,000 (*see* Exhibit 9).

113.    As a result of its reliance, State Farm Fire incurred damages of at least $600,000. State Farm Fire paid the following amounts to each of the Clinics based on its reliance:

(a)    Delaware Diagnostic:  more than $200,000 (*see* Exhibit 6);

(b)    Atkins Practice:  more than $40,000 (*see* Exhibit 7);

(c)    Cary Practice:  more than $270,000 (*see* Exhibit 8); and

(d)    King Practice: more than $120,000 (*see* Exhibit 9).

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Dr. Atkins, Dr. Cary, Dr. King, Delaware Diagnostic, Atkins Practice, Cary Practice, and King Practice for compensatory damages, costs, and any other relief the Court deems just and appropriate.

## <u>SECOND CLAIM FOR RELIEF</u>
### (Violation of Civil Conspiracy Against Dr. Atkins, Dr. Cary, Dr. King, Delaware Diagnostic, Cary Practice, and King Practice)

114.    State Farm Mutual and State Farm Fire incorporate paragraphs 1 through 103 as if fully set forth herein.

115.    Each Defendant – Dr. Atkins, Dr. Cary, Dr. King, Delaware Diagnostic, Cary Practice, and King Practice – knowingly agreed and conspired to conduct and participate, directly or indirectly, in the scheme when they submitted or caused to be submitted claims that were fraudulent and unlawful (as described above in paragraphs 1 through 103).

116.     Dr. Atkins, Dr. Cary, Dr. King, Delaware Diagnostic, Cary Practice, and King Practice each agreed to act and did act in furtherance of the common and overall objective of the conspiracy to fraudulently obtain no-fault insurance benefits by facilitating the submission of bills and supporting documentation that made intentional misrepresentations that the examinations, diagnoses, services, and medications were medically necessary and were lawful for the claim numbers identified in Exhibits 6, 8, and 9.

117.     Accordingly, the Defendants are jointly and severally liable to State Farm Mutual and State Farm Fire for the damages caused by the Defendants' conspiracy.

118.     State Farm Mutual has been injured in its business and property by reason of Defendants' conduct in that it paid almost $475,000 based upon the fraudulent submission of bills and supporting documentation.

119.     State Farm Fire has been injured in its business and property by reason of Defendants' conduct in that it paid more than $565,000 based upon the fraudulent submission of bills and supporting documentation.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Defendants for compensatory damages plus interest, and any other relief the Court deems just and proper.

## THIRD CLAIM FOR RELIEF
### (Unjust Enrichment Against the Clinics)

120.     State Farm Mutual and State Farm Fire incorporate, as if fully set forth herein, each and every allegation in paragraphs 1 through 103.

121.     There is no contract between State Farm Mutual and any of Defendants that governs State Farm Mutual's payment of no-fault insurance benefits to Defendants.

122.     There is no contract between State Farm Fire and any of Defendants that governs State Farm Fire's payment of no-fault insurance benefits to Defendants.

ME1 28566859v.2

123.    State Farm Mutual and State Farm Fire have been impoverished by the payment of insurance benefits by State Farm Mutual and State Farm Fire to the Clinics.  The Clinics were enriched by State Farm Mutual's and State Farm Fire's payments.

124.    There is a direct relationship between State Farm Mutual and State Farm Fire and the Clinics.  The Clinics billed for the services purportedly provided by the Doctors and other Clinic personnel to the State Farm Insureds, billed State Farm Mutual and State Farm Fire for those services, and State Farm Mutual and State Farm Fire paid the Clinics for those services.

125.    There is no justification for Defendants' conduct or their retention of State Farm Mutual and State Farm Fire's payments to them.  As described herein, Defendants engaged in an intentional and fraudulent scheme to obtain insurance benefits from State Farm Mutual and State Farm Fire.  Instead of treating each State Farm Insured based on his or her individual needs, Defendants engaged in a predetermined treatment protocol that involved prescribing large quantities of opioid pain relievers to most patients, requiring patients to complete a compulsory round of physical therapy at the outset of treatment, and directing patients to return for follow-up examinations every month and using the opioid prescriptions as an inducement to ensure that patients continued treating with Defendants.  Rather than employing necessary and adequate safeguards in connection with prescribing dangerous and highly addictive opioid pain medications, Defendants largely neglected to use even the most basic safeguards such as checking the Delaware Prescription Monitoring Program, utilizing treatment agreements, performing pill counts, and requiring periodic urine drug testing.  Defendants' conduct not only defrauded State Farm Mutual and State Farm Fire, but depleted State Farm Insureds' no-fault insurance benefits for unnecessary services and, worst of all, endangered State Farm Insureds' health.

126.    State Farm Mutual and State Farm Fire plead unjust enrichment in the alternative to their fraud claim.  If State Farm Mutual and State Farm Fire are unsuccessful on that claim, then State Farm Mutual and State Farm Fire will have no remedy at law for Defendants' wrongful conduct.

ME1 28566859v.2

127.   State Farm Mutual and State Farm Fire seek restitution of their payments to Clinics for services rendered from January 1, 2016 through the present, as set forth in Exhibits 6, 7, 8 and 9.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Defendants for restitution, costs, and any other relief the Court deems just and proper.

## FOURTH CLAIM FOR RELIEF

### (Declaratory Relief Pursuant to 28 U.S.C. § 2201 Against the Clinics)

128.   State Farm Mutual and State Farm Fire incorporates, as if fully set forth herein, each and every allegation in paragraphs 1 through 103.

129.   There is an actual controversy between State Farm Mutual and State Farm Fire, on the one hand, and the Clinics, on the other hand, as to State Farm Mutual and State Farm Fire's obligation to pay the Clinics' unpaid (whether in whole or in part) bills for services rendered to State Farm Insureds, which claims and unpaid amounts are identified in Exhibits 6, 7, 8 and 9.

130.   As described herein, Defendants engaged in an intentional and fraudulent scheme to obtain insurance benefits from State Farm Mutual and State Farm Fire.  Instead of treating each State Farm Insured based on his or her individual needs, Defendants engaged in a predetermined treatment protocol that involved prescribing large quantities of opioid pain relievers to most patients, requiring patients to complete a compulsory round of physical therapy at the outset of treatment, and directing patients to return for follow-up examinations every month and using the opioid prescriptions as an inducement to ensure that patients continue treating with Defendants.  Rather than employing necessary and adequate safeguards in connection with prescribing dangerous and highly addictive opioid pain medications, Defendants largely neglected to use even the most basic safeguards such as checking the Delaware Prescription Monitoring Program, utilizing treatment agreements, performing pill counts, and requiring periodic urine drug testing.  Defendants' conduct not only defrauded State Farm

Mutual and State Farm Fire, but depleted State Farm Insureds' no-fault insurance benefits for unnecessary services and, worst of all, endangered State Farm Insureds' health.

131.    As a result of Defendants' fraudulent and unlawful conduct, State Farm Mutual and State Farm Fire do not owe the Clinics payment for any unpaid bills.

132.    Because Defendants provided services to State Farm Insureds that were not medically necessary, State Farm Mutual and State Farm Fire do not owe the Clinics any payment for any unpaid bills.

133.    Accordingly, State Farm Mutual and State Farm Fire seek a declaration that they do not owe the Clinics for any unpaid bills, which claims and unpaid amounts are identified in Exhibits 6, 7, 8 and 9.

WHEREFORE, State Farm Mutual and State Farm Fire demand a declaratory judgment against the Clinics: (a) declaring that State Farm Mutual and State Farm Fire are not obligated to pay any unpaid bills for services that Defendants provided from January 1, 2016 through the present; (b) declaring that State Farm Insureds are not obligated to pay any unpaid bills for services that Defendants provided from January 1, 2016 through the present; and (c) granting such other and further relief this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), State Farm Mutual and State Farm Fire demand a trial by jury of all issues so triable.

ME1 28566859v.2

DATED: November 15, 2018

McCARTER & ENGLISH, LLP

/s/ Andrews S. Dupre
Andrew S. Dupre (#4621)
Alexandra Joyce (#6423)
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, Delaware 19801
(302) 984-6300
*adupre@mccarter.com*
*ajoyce@mccarter.com*

*Counsel for Plaintiffs*

OF COUNSEL:

David I. Spector
Adam K. Hodges
S. Montaye Sigmon
AKERMAN LLP
777 South Flagler Drive, Suite 1100
West Palm Beach, FL 33401
(561) 653-5000
*david.spector@akerman.com*
*adam.hodges@akerman.com*
*montaye.sigmon@akerman.com*

ME1 28566859v.2