**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY and STATE FARM FIRE AND CASUALTY COMPANY, | |
| Plaintiffs, | |
| v. | Civil Action No. 18-1806-CFC |
| DELAWARE DIAGNOSTIC & REHABILITATION CENTER, P.A.; CONRAD K. KING, JR., M.D., P.A.; DAMON D. CARY, D.O., P.A.; CONRAD K. KING, JR.; DAMON D. CARY; and WILLIAM R. ATKINS, JR., | JURY TRIAL DEMANDED |
| Defendants. | |

**AMENDED COMPLAINT**

Plaintiffs State Farm Mutual Automobile Insurance Company ("State Farm Mutual") and State Farm Fire and Casualty Company ("State Farm Fire") bring this complaint against Delaware Diagnostic & Rehabilitation Center, P.A. ("Delaware Diagnostic"), Conrad K. King, Jr., P.A. ("King Practice"), Damon D. Cary, D.O., P.A. ("Cary Practice"), Conrad K. King, Jr. ("Dr. King"), M.D., Damon D. Cary, D.O. ("Dr. Cary), and William R. Atkins, Jr., M.D. ("Dr. Atkins") (collectively "Defendants"), and allege as follows:

**Nature of the Case**

1.      This action seeks to recover money fraudulently and unlawfully obtained from State Farm Mutual and State Farm Fire by Defendants through a scheme to obtain patients' no-fault insurance benefits by delivering medical services that were not tailored to the individualized complaints and needs of the patients and Defendants' false representations (or omissions) about their bills and services.

1

2.     Defendants are all health care providers who treated patients involved in automobile accidents who were or are insured by State Farm Mutual or State Farm Fire ("State Farm Insureds").

3.     In general, the State Farm Insureds began treatment with Defendants shortly after an auto accident for relatively minor injuries.  Almost all of the insureds involved in this case were diagnosed with some type of "sprain" or "strain."

4.     The vast majority of State Farm Insureds (more than 90%) received prescriptions for opioid pain medications, such as oxycodone, hydrocodone or codeine—typically on the initial visit.  Although these types of medication should be reserved for significant and debilitating pain, Defendants routinely and repeatedly prescribed them for minor "sprains" and "strains" immediately following minor auto accidents.

5.     Opioid medications, like those prescribed by the Defendants, pose a significant risk of addiction and abuse.  Consequently, medical professionals must employ safeguards to prevent misuse or diversion of opioids.  Defendants, however, did not employ those safeguards. To streamline their operations to obtain maximum insurance benefits from State Farm Mutual and State Farm Fire, Defendants largely neglected to use even the most basic safeguards such as checking the Delaware Prescription Monitoring Program, utilizing treatment agreements, performing pill counts, and requiring initial and periodic drug testing.  In the rare instances where these safeguards were employed, the results were not sufficiently documented in the medical records and Defendants did not change their course of treatment based on the results.

6.     Indeed, rather than protecting their patients from the dangers of opioids, Defendants capitalized on the addictive nature of opioids and the fact that opioid prescriptions could only be written for a 31-day supply.  Defendants used opioid prescriptions to induce patients to repeatedly return to Defendants for unreasonable and unnecessary patient examinations, which Defendants billed to State Farm Mutual and State Farm Fire.  *See* Exam & Re-Exam Treatment Summary, attached as Exhibit 1.

7.      Defendants also prescribed an initial round of "physical therapy" for most patients (approximately 76%).  These treatments consisted primarily of passive treatments rendered by non-licensed clinic staff that were not designed to improve each patients' individual injuries, but to increase Defendants' billings and profits.

8.      Dr. Atkins, Dr. Cary, Dr. King, Delaware Diagnostic, the Cary Practice, and the King Practice collectively established and implemented a standardized treatment protocol concerning the prescription of opioids and physical therapy wherein they purported to examine patients and prescribed patients the same course of treatment irrespective of the patients' complaints, injuries, prognosis, or medical needs, all to maximize their revenue. Defendants placed patients on the predetermined treatment plan instead of properly assessing them, identifying their injuries, and providing them with individualized treatment.

9.      As a result of Defendants' conduct: (a) patients were not legitimately and appropriately treated for conditions they may have had; (b) patients were subjected to medically unnecessary physical therapy treatments and received unnecessary and highly addictive opioid medications; and (c) patients' limited insurance benefits were substantially reduced or exhausted and, therefore, were not available for any legitimate medical treatment the patients may have needed.

10.     Defendants treated 225 State Farm Insureds[1] with dates of loss from January 2016 to April 2018 and billed State Farm Mutual or State Farm Fire for the services allegedly provided to those insureds.

11.     Through their fraudulent and unlawful scheme, Defendants obtained combined insurance benefits payments from State Farm Mutual and State Farm Fire in excess of $1.1 million.

12.     In this action, State Farm Mutual and State Farm Fire seek to recover their payments to Defendants through common law claims for fraud, unjust enrichment, and civil

---

[1] Some of these 225 State Farm Insureds were involved in more than one auto accident and treated with Defendants after each accident.  Defendants submitted bills in connection with a total of 219 patients.

conspiracy. State Farm Mutual and State Farm Fire also seek a declaratory judgment confirming that they are not obligated to pay any of Defendants' unpaid bills, invoices or demands because Defendants' services were fraudulent, unnecessary, and unlawful.

## Jurisdiction and Venue

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the action is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to State Farm Mutual's and State Farm Fire's claims occurred in this judicial district.

## Parties

15.     Plaintiff State Farm Mutual is an Illinois property and casualty insurer incorporated under the laws of Illinois with its principal place of business in Bloomington, Illinois. State Farm Mutual is qualified to conduct business in Delaware.

16.     Plaintiff State Farm Fire is an Illinois property and casualty insurer incorporated under the laws of Illinois with its principal place of business in Bloomington, Illinois. State Farm Fire is qualified to conduct in business in Delaware.

17.     State Farm Mutual and State Farm Fire issue automobile insurance policies in Delaware, which provide insurance coverage for, among other things, reasonable and necessary expenses for medical, hospital, dental, surgical, medicine, x-ray, and ambulance services for injuries resulting from automobile accidents.

18.     Defendant Conrad K. King, Jr., M.D. is a citizen of Delaware who at all times relevant to this action resided in Wilmington, Delaware. Dr. King is licensed to practice medicine in Delaware and is registered to prescribe controlled substances. Dr. King claims to specialize in pain management.

19.     Defendant Damon D. Cary, D.O. is a citizen of Pennsylvania who resides in Philadelphia, Pennsylvania. At all times relevant to this action, Dr. Cary practiced medicine and

treated State Farm Insureds in Wilmington, Delaware and Newark, Delaware. Dr. Cary is licensed to practice medicine in Delaware and is registered to prescribe controlled substances. Dr. Cary claims to specialize in pain management.

20.    Defendant William R. Atkins, Jr., M.D. is a citizen of Delaware who at all times relevant to this action resided in Wilmington, Delaware. Dr. Atkins is licensed to practice medicine in Delaware and is registered to prescribe controlled substances. Dr. Atkins claims to specialize in pain management.

21.    Dr. King, Dr. Cary, and Dr. Atkins are collectively referred to as "the Doctors."

22.    Defendant Delaware Diagnostic & Rehabilitation Center, P.A. is a Delaware professional association with its principal place of business at 1700 Wawaset Street, Suite 100, Wilmington, Delaware 19806. Dr. King and Dr. Atkins own or owned Delaware Diagnostic. Sixty-seven patients treated at Delaware Diagnostics for which bills were submitted to the State Farm Plaintiffs. For the 67 patients, Delaware Diagnostics provided 471 evaluation visits which were performed by Dr. King (202 evaluation visits) and Dr. Atkins (269 evaluation visits). Dr. King may have sold or transferred his interest in Delaware Diagnostic to Dr. Atkins in or around December 2017.

23.    Defendant Conrad K. King, Jr., M.D., P.A. is a Delaware professional association with its principal place of business at 1400 Peoples Plaza, Suite 233, Newark, Delaware 19702. Dr. King owns or owned the King Practice. Sixty-four patients received initial or follow up evaluations at the King Practice for which bills were submitted to the State Farm Plaintiffs. For the 64 patients, the King Practice provided 494 evaluation visits which were performed by Dr. King (49 evaluation visits), Dr. Cary (340 evaluation visits), and physician assistant Margaret Love (105 evaluation visits). Dr. King may have sold or transferred his practice to Dr. Cary in or around December 2017.

24.    Defendant Damon D. Cary, D.O., P.A. is a Delaware professional association with its principal place of business at 305 North Union Street, Suite 110, Wilmington, Delaware 19805. One hundred thirty-two patients received initial or follow up evaluations at the Cary

Practice for which bills were submitted to the State Farm Plaintiffs. For the 132 patients, the Cary Practice provided 1,037 initial or follow up evaluations which were performed by Dr. Cary (752 evaluation visits), Dr. King (1 evaluation visit), and physician assistant Margaret Love (284 evaluation visits). Dr. Cary owns the Cary Practice.

25.    Delaware Diagnostic, the King Practice, and the Cary Practice are collectively referred to as "the Clinics."

### Delaware Motor Vehicle Insurance Coverage

26.    State Farm Mutual and State Farm Fire issue motor vehicle insurance policies in Delaware.

27.    Under Delaware law, motor vehicle owners are required to purchase minimum insurance coverages including coverage to compensate injured persons in the covered driver's motor vehicle regardless of whether the vehicle's driver was at fault in causing the accident. This coverage is commonly called personal injury protection insurance or no-fault insurance.

28.    The no-fault coverage must provide "[c]ompensation to injured persons for reasonable and necessary expenses incurred within 2 years from the date of the accident." *See* Del. Code Ann. tit. 21, § 2118(a)(2).  The coverage includes reasonable and necessary medical services, expenses and certain other specified expenses. *See Id.*

29.    Pursuant to Delaware law and the terms of their insurance policies, State Farm Mutual and State Farm Fire are obligated to pay medical expenses only if they are reasonable, necessary, and related to an injury caused by the accident.

30.    The statutory minimum amount of no-fault insurance coverage is $15,000 for one person and $30,000 for all persons injured in any one accident.  *See* Del. Code Ann. tit. 21, § 2118(a)(2).  The minimum coverage amount is subject to any deductibles and percentage reductions as provided in the applicable policy. *See Id.*

31.    An insured can assign his or her right to no-fault insurance benefits to a medical provider in exchange for medical services to treat the insured's injuries resulting from the accident.  A properly executed assignment of benefits allows a medical provider to submit claims

6

directly to automobile insurance companies and receive payment directly from the insurance company for necessary medical services.

32.    Here, each of the Defendants submitted bills and medical records directly to State Farm Mutual and State Farm Fire to support Defendants' claims for payment of no-fault insurance benefits.  Defendants' submission of bills for payment constituted a representation that the medical services were: (a) for injuries resulting from the automobile accident; (b) reasonable; and (c) medically necessary.

### Delaware's Regulation of Opioid Prescriptions

33.    The prescription medications at issue in this case (for example, oxycodone, hydrocodone or codeine) are designated Schedule II or Schedule III controlled substances under federal and state law.  *See* 21 C.F.R. §§ 1306.12(a) and 1308.13; *see also* Del. Code Ann. tit. 16, §§ 4718 and 4739(b).

34.    A Schedule II controlled substance is a drug that has an accepted medical use, but which has high potential for abuse that may lead to severe psychological or physical dependence. *See* 21 U.S.C. § 812(b); Del. Code Ann. tit. 16, § 4715.

35.    A Schedule III controlled substance is a drug that has an accepted medical use, but has a lower potential for abuse and may lead to moderate or low physical dependence or high psychological dependence.  *See* 21 U.S.C. § 812(b); Del. Code Ann. tit. 16, § 4717.

36.    Doctors may not prescribe refills for Schedule II controlled substances, including opioids, but rather must issue a new and separate prescription each time.  *See* 21 C.F.R. § 1306.12(a); Del. Code Ann. tit. 16, § 4739(b)

37.    In Delaware, a physician can only write a prescription for a Schedule II or Schedule III controlled substance for 100 dosage units or a 31-day supply, whichever is greater. 24 Del. Admin. Code CSA § 4.7.1.

### Delaware's Efforts to Curb Opioid Misuse and Diversion

38.    In 2013, the Delaware Prescription Drug Action Committee noted that "[o]ver the last two decades, the drug overdose mortality rate has accelerated rapidly both nationwide and in

Delaware. The overwhelming majority of the drug overdose mortality deaths have been caused by prescription drug abuse and misuse, <u>particularly in the opioid pain reliever category</u>."[2]

39.    In fact, almost two million Americans abused or were dependent on prescription opioids in 2014.[3] The Centers for Disease Control and Prevention ("the CDC") reports that as many as one in four people who receive prescription opioids for non-cancer pain in primary care settings struggles with addiction.[4]

40.    Opioids are not only addictive, but can be lethal. According to the CDC, more people died from drug overdoses in 2016 than in any prior year on record and more than six out of ten drug overdose deaths involved an opioid.[5]  From 1999 to 2016, more than 350,000 people in the United States died from overdoses related to opioids.[6]  In 2014 alone, 189 people died in Delaware from drug overdoses.

41.    On July 15, 2010, Delaware implemented a prescription drug monitoring program.  The program requires a prescriber of a schedule II controlled substance (which includes nearly all opioids) to first obtain "a patient utilization report regarding the patient for the preceding 12 months from the computerized program established by the office of controlled

---

[2] Substance Abuse and Mental Health Services Administration, National Survey on Drug Use and Health, 2014                *available*                    *at* *http://www.samhsa.gov/data/sites/default/files/2014_National_Survey_of_Substance_Abuse_Treatment_Services/2014_National_Survey_of_Substance_Abuse_Treatment_Services.pdf* (emphasis added).

[3] Substance Abuse and Mental Health Services Administration, National Survey on Drug Use and Health, 2014                *available*                    *at* *http://www.samhsa.gov/data/sites/default/files/2014_National_Survey_of_Substance_Abuse_Treatment_Services/2014_National_Survey_of_Substance_Abuse_Treatment_Services/2014_National_Survey_of_Substance_Abuse_Treatment_Services.pdf.*

[4]    CDC,    "Injury    Prevention    &    Control:    Opioid    Overdose,"    *available    at* *https://www.cdc.gov/drugoverdose/data/overdose.html.*

[5] Rudd et al., "Increases in Drug and Opioid Overdose Deaths – United States, 2000-2014," Morbidity and Mortality    Weekly    Report    (MMWR)    (Jan.    1,    2016),    *available    at* *http://www.cdc.gov/mmwr/preview/mmwrhtml/mm6450a3.htm?s_cid=mm6450a3_w*; Scholl et al., "Overdose Deaths Involving Opioids, Cocaine, and Psychostimulants – United States, 2015-2016," Morbidity and Mortality Weekly Report (MMWR) (Mar. 30, 2018), *available at https://www.cdc.gov/mmwr/volumes/67/wr/mm6712a1.htm.*

[6] *See* Dowell et al., "CDC Guidelines for Prescribing Opioids for Chronic Pain – United States, 2016," Morbidity    and    Mortality    Weekly    Report    (MMWR)    (Mar.    18,    2016),    *available    at* *https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm*; Scholl et al., "Overdose Deaths Involving Opioids, Cocaine, and Psychostimulants – United States, 2015-2016," Morbidity and Mortality Weekly Report (MMWR) (Mar. 30, 2018), *available at https://www.cdc.gov/mmwr/volumes/67/wr/mm6712a1.htm.*

substances when the prescriber has a reasonable belief that the patient may be seeking the controlled substance, in whole or in part for any reason other than the treatment of an existing medical condition.  The prescriber shall review the patient utilization report to assess whether the prescription for the controlled substance is necessary."  Del. Code Ann. tit. 2, § 4798 (e).

42.    Pain management specialists generally agree that it is appropriate and part of the general standard of care to periodically verify a patient's prescription history via a prescription monitoring program any time opioid pain medications are prescribed for an extended period of time.

43.    In 2011, the Delaware Board of Medical Licensure and Discipline adopted the Federation of State Medical Boards' Model Policy for the Use of Controlled Substances for Treatment of Pain ("the Model Policy").  *See* 24 Del. Admin. Code § 1700.18.0 *et seq.*  The Model Policy was "developed to define specific requirements applicable to pain control, particularly related to the use of controlled substances, to alleviate licensed practitioners' uncertainty to encourage better pain management, and to minimize practices that deviate from the appropriate standard of care and lead to abuse and diversion."  24 Del. Admin. Code § 1700.18.0.

44.    The Board explicitly recognized that "the use of opioid analgesics for other than legitimate medical purposes can pose a threat to the individual and society and that the inappropriate prescribing of controlled substances, including opioid analgesics, may lead to drug diversion and abuse by individuals who seek them for other than legitimate medical use. Accordingly, these regulations mandate that licensed practitioners incorporate safeguards into their practices to minimize the potential for the abuse and diversion of controlled substances." 24 Del. Admin. Code § 1700.18.0.

45.    Delaware regulations further provide that "[a]t a minimum, practitioners who regularly treat patients for chronic pain must educate themselves about the current standards of care applicable to those patients."  24 Del. Admin. Code § 1700.18.6.

46.    When evaluating the treatment of chronic pain, a "medical history and physical

examination <u>must</u> be obtained, evaluated, and documented in the medication record.   The evaluation <u>must document</u>: [ ] etiology, the nature and intensity of the pain, current and past treatments for pain, [ ] underlying or coexisting diseases or conditions, [ ] the effect of pain on physical and psychological function, and history of substance abuse, [and] the presence of one or more recognized medical indications for the use of a controlled substance."  24 Del. Admin. Code § 1700.18.1 (emphasis added).  Further, these criteria "may be applicable to prescribing controlled substances for the treatment of acute pain when clinically appropriate." *Id.*

47.    The purpose of taking a comprehensive medical history is particularly important when prescribing opioids so that practitioners can identify general risk factors for diversion and addiction, which include, but are not limited to, family or personal history of abuse, active psychiatric disorders such as anxiety or depression, age 45 years old or younger, and a lack of supportive family relationships.

48.    When prescribing controlled substances for the treatment of pain, "[a] written treatment plan <u>is required</u> and must state goals and objectives that will be used to determine treatment success, such as pain relief and improved physical and psychological function, and should indicate if any further diagnostic evaluations or other treatments are planned.  . . .  After treatment begins, the practitioner must adjust drug therapy to the individual needs of each patient."  24 Del. Admin. Code § 1700.18.2 (emphasis added).

49.    The doctor "<u>shall</u> periodically review the course of pain treatment and any new information about the etiology of the pain or the patient's state of health.  Periodic review shall include, at a minimum, evaluation of the following: [ ] continuation or modification of controlled substances for pain management therapy depending on the practitioner's evaluation of the patient's progress toward treatment goals and objectives[;] satisfactory response to treatment as indicated by the patient's decreased pain, increased level of function, or improved quality of life . . .[;] if the patient's progress is unsatisfactory, the practitioner shall assess the appropriateness of continued use of the current treatment plan and consider the use of other therapeutic modalities."  24 Del. Admin. Code § 1700.18.5 (emphasis added).

50.     Medical practitioners are required to appropriately document each visit and must include, for each visit, "the interim history and physical examination, vital signs as clinically appropriate, assessment of progress, and medication plan."  24 Del. Admin. Code § 1700.18.8.

51.     Doctors who prescribe or dispense controlled substances are required to maintain a record of the name and address of the patient, the date the medication was prescribed, and the name, strength, amount of the medication and whether any additional medication is authorized. 24 Del. Admin. Code CSA § 6.1.2. In March of 2016, the CDC released guidelines related to prescribing opioids for chronic non-cancer pain, which focuses on non-pharmacological and non-opioid therapies.[7] The CDC guideline recommends three days or less of immediate release opioids for the treatment of acute pain, indicating that seven days will rarely be needed.[8]

### Delaware's Regulations for Safe Prescribing of Opioid Analgesics

52.     On April 1, 2017, Delaware adopted new regulations governing the "Safe Prescribing of Opioid Analgesics," which included distinct guidelines to address the use of opioids to address acute pain and chronic pain.  *See* 24 Del. Admin. Code CSA § 9.0 et seq.

53.     As a threshold matter, each practitioner must be licensed by Delaware "and registered with the U.S. Drug Enforcement Administration and must comply with all applicable federal and state regulations."  *Id.* at § 9.2.

54.     The regulations define "acute pain" as the "normal predicted physiological response to a noxious chemical, thermal or mechanical stimulus and typically is associated with invasive procedures, trauma, and disease.  It is generally time limited.  For the purpose of this Regulation, Acute Pain is less than three months in duration."  *Id.* at § 9.3.2

55.     Generally, a first time prescription for an opioid analgesic cannot exceed a seven-day supply.  *Id.* at §§ 9.5.1 & 9.5.2.  However, an opioid prescription longer than seven days may be issued if it is warranted "in the professional medical judgment of a practitioner . . . to treat

---

[7] *See* Dowell et al., "CDC Guidelines for Prescribing Opioids for Chronic Pain – United States, 2016," Morbidity and Mortality Weekly Report (MMWR) (Mar. 18, 2016), *available at* https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm.

[8] *See Id.*

[the] acute medical condition." *Id.* at § 9.5.3.  In such circumstances, the practitioner must document the condition triggering the prescription in the patient's medical record, query the Prescription Monitoring Program to obtain a prescription history, indicate that a non-opiate alternative was not appropriate to address the medical condition, obtain an informed consent form signed by the patient, and schedule and undertake follow up visits and evaluation to monitor and assess the patient's progress towards goals in the treatment plan and modify the plan as necessary.  *Id.* at §§ 9.5.3, 9.6.4 and 9.6.5.

56.     After the initial prescription and prior to issuing a subsequent prescription, the practitioner must perform an appropriate evaluation of the patient's medical history and condition, which includes a query of the Prescription Monitoring Program for the first visit after the initial prescription, administer a fluid drug screen (at the discretion of the practitioner), conduct a physical examination which must include a discussion of the risks and benefits of opioid analgesics and possible alternatives to their use, obtain an informed consent form signed by the patient and schedule and undertake follow up visits and evaluation to monitor and assess the patient's progress towards goals in the treatment plan and modify the plan as necessary.  *Id.* at §§ 9.6-9.6.5.

57.     The Regulations explain that the informed consent must include at least information pertaining to:

(a)     the drug's potential for addiction, abuse and misuse;

(b)     the risks associated with the drug of life threatening respiratory depression;

(c)     the risks of overdose as a result of accidental exposure potentially fatal, especially in children;

(d)     neonatal opioid withdrawal symptoms; and

(e)     a potentially fatal overdose when interacting with alcohol and other potentially fatal drugs or drug interactions such as benzodiazepines.

*Id.* at § 9.6.4.

58.     The Regulations define "Chronic Pain" as "a state in which pain persists beyond the usual course of an acute disease or healing of an injury or that may or may not be associated with an acute or chronic pathologic process that it causes continuous or intermittent pain over months or years.  For the purpose of this Regulation, Chronic Pain means continuous or nearly continuous pain more than three months in duration."  *Id.* at § 9.3.6.

59.     In order to prescribe opioids for chronic pain patients, a provider must comply with the requirements of subsection 9.6 and follow certain additional safeguards.  *See id.* at § 9.7.

60.     For chronic pain patients, a practitioner must query the Prescription Monitoring Program:

(a)     at least every six months (more if clinically indicated),

(b)     whenever the patient is also prescribed a benzodiazepine,

(c)     if the patient is assessed to be at risk for substance abuse or misuse, or

(d)     if a patient demonstrates such things as loss of prescriptions, requests for early refills or similar behavior.

*Id.* at § 9.7.1 & 9.7.2.

61.     In addition, for chronic pain patients, the practitioner is to administer a fluid drug screen at least every six months, obtain a signed treatment agreement, conduct a risk assessment, document in the record alternative treatment options that have been tried by the patient and their adequacy in providing sufficient management of pain, and query the Prescription Monitoring Program *at least* every six months, or whenever the patient is prescribed a benzodiazepine, or assessed to be at risk for misuse or abuse. *Id.* at § 9.8.

62.     The Doctors each held themselves out to be pain management physicians and each routinely prescribed opioids to their patients (overwhelmingly from their first patient encounter) such that they knew, and were required to know, the standards of care for their profession, knew the dangers of the over-prescription of opioids, and were aware of the exploding opioid crisis.

63.     Notwithstanding, the Doctors did not comply with the foregoing standards and

requirements under Delaware law in treating the State Farm Insureds.

**Defendants Engaged in Scheme Designed to Maximize Their Own Revenues**

64.    Defendants' medical services were neither reasonable nor necessary as a result of the automobile accident, but were furnished as a consequence of Defendants' unlawful and fraudulent scheme that they designed to exploit patients' no-fault benefits.  Instead of treating each State Farm Insured based on his or her needs, the Defendants collectively established and implemented a scheme by which they: prescribed large quantities of opioid pain relievers to patients at their initial visits without using basic safeguards to ensure patients were not misusing or diverting the opioid medications; required patients to complete "physical therapy" treatment consisting of passive modalities that were designed to increase Defendants' billings rather than improve patients' medical conditions; directed patients to return for follow-up examinations every month to increase their billings rather than to legitimately determine whether the patients' condition was improving (or not improving); and used the opioid prescriptions as an inducement to ensure that patients continued treating with Defendants for extended periods of time.

65.    The Doctors all knew one another, practiced together, had access to each of the at-issue patients' medical files, worked closely to co-treat patients, conspired to establish the predetermined treatment plan, and employed the same uniform treatment to hundreds of patients at multiple Clinics at different locations throughout several years. Regardless of which Doctor treated which patient at which Clinic, the treatment rendered was remarkably similar.

66.    Specifically, Dr. King, Dr. Atkins, and Dr. Cary have worked together since at least 2009 at Delaware Diagnostic. Based on the bills and records the Doctors and Delaware Diagnostic submitted to the State Farm Plaintiffs during this time period, there were numerous instances in which two or more of the Doctors jointly treated or co-treated the same patient.  For example during that time frame:

> (a)    Dr. King and Dr. Cary treated patient J.L. (Claim No. 08-5225-649) with Dr. King seeing the patient on 19 visits and Dr. Cary seeing the patient on 13 visits.

(b)  Dr. King and Dr. Cary treated patient H.H. (Claim No. 08-5230-648) with Dr. King seeing the patient on 23 visits and Dr. Cary on 8 visits.

(c)  All three doctors treated patient A.D. (Claim No. 08-073D-985) with Dr. King seeing the patient on 11 visits, Dr. Cary seeing the patient on 1 visit, and Dr. Atkins on 1 visit.

(d)  Dr. King and Dr. Atkins both treated patient B.G. (Claim No. 08-0024-P49) at Delaware Diagnostics with Dr. King performing the initial evaluation followed by 19 visits performed by Dr. Atkins.

(e)  Dr. Atkins and Dr. Cary treated patient K.Y. (Claim No. 08-8J11-280) with Dr. Atkins treating the patient for his initial evaluation, Dr. Cary treating the patient at the following 9 visits, and Margaret Love, physician assistant, treating the patient for the final 3 visits.

67.    The Doctors continued co-treating patients at the different Clinics for many of the claims at issue. Specifically, Dr. King (202 evaluation visits) and Dr. Atkins (269 evaluation visits) performed 471 evaluations on patients at Delaware Diagnostic; Dr. King (49 evaluation visits), Margaret Love (105 evaluation visits), and Dr. Cary (340 evaluation visits) performed 494 evaluations on patients at the King Practice; and Dr. Cary (752 evaluation visits), Dr. King (1 evaluation visits), and Margaret Love (284 evaluation visits) performed 1,037 evaluations on patients at the Cary Practice.

68.    The Doctors conspired to implement and perform the same uniform treatment and over-prescription of medically unnecessary opioids and physical therapy not for the medical benefit of their patients, but rather, to maximize the financial benefit to themselves and the Clinics.

A.    _Opioid Prescriptions – Early Prescriptions and Repeated Renewals_

69.    First, the Doctors each over-prescribed opioid pain medications at the earliest stages of treatment without utilizing or adopting appropriate safeguards.

70.    The CDC estimates that only 20% of patients presenting to physician offices with non-cancer pain symptoms or pain-related diagnoses (including acute and chronic pain) receive an opioid prescription.[9]

71.    More than 93% of State Farm Insureds received a prescription for opioids during their treatment with Defendants.  (*See* Exhibit 2, Treatment Summary.)

72.    The Doctors prescribed an opioid at more than 88% of initial visits for which medical records were received.   (*See* Exhibit 1, Exam & Re-Exam Treatment Summary.) Specifically, Drs. Cary, King, and Atkins prescribed an opioid at more than 91%, 90%, and 70% of initial visits, respectively, for which medical records were submitted to State Farm Mutual and State Farm Fire. For example:

(a)    Patient M.J. (Claim No. 08-1225-6B6) presented at Delaware Diagnostic one month post-motor vehicle accident purportedly complaining of bilateral neck, low back, and shoulder pain. The patient explained he was the passenger in a vehicle that was struck by a moped. Dr. King noted he knew the patient well from prior treatment spanning from 12/14/11 to 12/5/13 (two years of pain management treatment) for a prior motor vehicle accident. Notwithstanding the fact the patient was in a minor accident and had a history of prolonged treatment (an indicator of potential abuse or misuse of opioids), Dr. King immediately prescribed the patient Percocet without first attempting non-opioid treatment. (*See* Sample Initial Evaluations, attached as Composite Exhibit 3.)

(b)    Patient D.J. (Claim No. 08-2521-P47) presented at Delaware Diagnostic one week post motor vehicle accident purportedly complaining of pain to his neck and mid/low back, as well as radicular pain into his right lower extremity and right buttock region. The patient reported he was in the McDonalds drive through when the person in front of him backed up into his vehicle. Notwithstanding the fact the patient was in a

---

[9] *See* Dowell et al., "CDC Guidelines for Prescribing Opioids for Chronic Pain – United States, 2016," Morbidity and Mortality Weekly Report (MMWR) (Mar. 18, 2016), *available at* https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm.

minor accident, Dr. Atkins immediately prescribed the patient Percocet without first attempting non-opioid treatment. (*See* Sample Initial Evaluations, attached as Composite Exhibit 3.)

(c)     Patient W.R. (Claim No. 08-7X35-663) presented at the Cary Practice two months post-motor vehicle accident purportedly complaining of pain to her neck, back, and shoulder. The patient reported she was the passenger in a parked car when a truck backed into her car. Notwithstanding the fact that the patient was in a minor accident, Dr. Cary immediately prescribed the patient Percocet without first attempting non-opioid treatment. (*See* Sample Initial Evaluations, attached as Composite Exhibit 3.)

(d)     Patient C.H. (Claim No. 08-801K-771) presented at the King Practice one week post-motor vehicle accident purportedly complaining of neck pain and headaches. The patient had a history of a prior motor vehicle accident and a slip and fall injury that left her with residual back and knee pain. Dr. Cary immediately prescribed the patient Percocet without first attempting non-opioid treatment. (*See* Sample Initial Evaluations, attached as Composite Exhibit 3.)

(e)     Patient C.M. (Claim No. 08-819C-540) presented at the King Practice two weeks post-motor vehicle accident purportedly complaining of upper back pain from being rear-ended. The patient had a history of a prior motor vehicle accident. Dr. King immediately prescribed the patient Percocet without first attempting non-opioid treatment. (*See* Sample Initial Evaluations, attached as Composite Exhibit 3.)

73.     At the initial examinations, the Doctors did not document why non-opioid treatment would be insufficient to curb the patients' purported pain, but rather immediately prescribed an unknown quantity of opioids and generally told the patients to follow-up in four weeks. As explained above, if the Doctors, in their professional judgment, believed *any* patient required more than a seven day supply of opioids at their initial visit the Doctors were required to document the "condition triggering the prescription of an opiate for more than a seven-day supply . . . in the patient's medical record, . . . query the PMP to obtain a prescription history [and

note the results], and . . . indicate that a non-opiate alternative was not appropriate to address the medical condition." *See* 24 Del. Admin. Code CSA § 9.5.3.

74.     Prescribing opioids at the initial visit without first attempting non-opioid and non-pharmacological treatments is outside the standard of care. The high percentage of opioids the Doctors uniformly prescribed early in treatment were not reasonable, not related to the (often minor) motor vehicle accidents, and were not prescribed due to the individual medical necessity of the patients, but rather were prescribed in furtherance of a conspiracy between the Doctors and the Clinics to over-prescribe medically unnecessary opioids to substantially deplete or exhaust the patients' no-fault insurance benefits and maximize profits.

75.     Even assuming an opioid was appropriate to treat acute pain after a minor automobile accident that resulted in various strains and sprains, repeated opioid prescriptions generally are not required for the vast majority of auto accident patients.  Defendants, however, repeatedly prescribed opioids for more than twelve months for many patients.

76.     In total, the Doctors prescribed an opioid pain medication at over 91% of the 2,002 patient examination and re-examination visits.  (*See* Exhibit 1, Exam & Re-exam Treatment Summary.)  Specifically, Drs. Cary, King, and Atkins prescribed an opioid at more than 93%, 95%, and 76% of their respective patient examination and re-examination visits.

77.     After each examination and re-examination, the Doctors directed the patients to return for a follow-up examination every four weeks at which time the patients received a minimal evaluation and a renewal of their opioid prescription. The re-examinations were not thorough, did not generally include the safeguards outlined above and were not performed to legitimately examine and treat the patients, but rather to substantially deplete or exhaust the patients' no-fault insurance benefits and maximize profits.

78.     By prescribing opioid pain medications to more than 90% of their patients, Defendants increased the likelihood patients would return for monthly visits to obtain new prescriptions – which most of the patients did for extended periods of time.  Indeed, the average

duration of treatment for State Farm Insureds after each accident was 233 days with 8.9 re-examination visits.  (*See* Exhibit 2, Treatment Summary.)

79.     In issuing and re-issuing opioid prescriptions, Defendants' actions fell well below the standard of care and instead ensured that the patients would continue to seek renewals for inappropriate and dangerous opioid medications.

### B.     *Failure to Employ Safeguards*

80.     Defendants failed to utilize the standard practices adopted by legitimate pain specialists throughout Delaware and across the country to increase the safety and effectiveness of prescribing opioids for non-cancer pain.

81.     As noted above, proper prescription documentation of the medication, strength, frequency of usage, and dosage is necessary to correlate and evaluate the medication's therapeutic benefits and side effects and manage the patient's care.  However, the Doctors failed to appropriately document the medications they prescribed.  For example, on the majority of patient records, the Doctor only documented the type of medication (i.e., Percocet). On other records, the Doctors did not list the type of medication and simply documented the words "refill pain meds."  The name of the medication, strength, and dosage instructions were not indicated. (*See* Sample Patient Records, attached as Composite Exhibit 4.) It's important to be specific when prescribing controlled substances like opioids so that appropriate use, therapeutic benefit, side effects, aberrant behaviors, and functional status can be correlated to the opioid being prescribed. Failing to include this information falls outside the standard of care and evidences the Doctors were not trying to rehabilitate their patients and manage their pain, but rather were simply examining the patients and completing the chart notes to generate a medical record for which they could get paid.

82.     Further, Delaware law requires a prescriber to obtain a report from the Prescription Monitoring Program reflecting a patient's prescription drug utilization if the prescriber has a reasonable belief the patient may be seeking the controlled substance for any

reason other than treatment of an existing medical condition. The Doctors routinely failed to comply with this requirement. According to Defendants' medical records:

(a)     Between all of the Doctors and physician assistant, Ms. Love, the Prescription Monitoring Program was check only 2% of the time.

(b)     Dr. Cary did <u>not</u> check the Delaware Prescription Monitoring Program <u>a single time</u> during 1,092 patient visits of State Farm Insureds. (*See* Exhibit 1, Exam & Re-exam Treatment Summary.)

(c)     Margaret Love, a physician's assistant, who performed evaluations for the Cary Practice and the King Practice, did <u>not</u> check the Delaware Prescription Monitoring Program <u>a single time during her 389 patient visits</u>.

(d)     Dr. Atkins did not check the Delaware Prescription Monitoring Program 90% of the time during his 269 patient exams of State Farm Insureds. (*See* Exhibit 1, Exam & Re-exam Treatment Summary.) Of the few times Dr. Atkins checked the Prescription Monitoring Program, he did not report the results, but simply included notations such as: "PMP was queried."

(e)     Dr. King did not check the Delaware Prescription Monitoring Program more than 90% of the time during his 252 patient exams of State Farm Insureds. (*See* Exhibit 1, Exam & Re-exam Treatment Summary.) Of the few times Dr. King checked the Prescription Monitoring Program, he did not report the results, but simply included notations such as: "PMP was queried."

83.     One safeguard utilized by pain management doctors (which was later codified) is the use of a treatment agreement. In the pain management context, a treatment agreement is a written agreement between the patient and his or her medical provider in which the patient agrees to certain terms and conditions of receiving addictive pain medications, including routine drug testing, how renewals of pain medications will be evaluated and handled, the reasons for which pain medications may be discontinued, and a requirement that the patient receive prescriptions from only one licensed practitioner. The medical records reflect Defendants

rarely entered into treatment agreements with their patients. For patients where such agreements were purportedly entered into, the actual agreements were missing from the records.

84.    Pill counts are another monitoring mechanism for doctors prescribing opioids where the doctors count the remaining opioid tablets during each patient visit for medication renewal to ensure patients are using the medication properly and make any appropriate adjustments to dosage, frequency or the number of pills provided.  Defendants' medical records reflect they *never* performed a pill count on any patient during the 2,002 patient visits.  (*See* Exhibit 1, Exam & Re-exam Treatment Summary.)

85.    Another standard practice is to perform routine drug testing which assists a provider in ensuring a patient's compliance with the prescribed opioid regime and to monitor the use of any non-prescribed or illicit substances.  Urine drug testing results aid in clinical decision-making with respect to continuation, discontinuation, or modification (for example, limiting the supply, selecting a drug with lower street value, requiring more frequent office visits, performing more frequent pill counts, consulting with a substance abuse specialist) of opioid therapy.  A minimum of one urine drug test per year should be performed on every patient who receives prescriptions for opioids on a long-term basis.

86.    The Doctors failed to order drug testing on State Farm Insureds at nearly 88% of the patient examinations and re-examinations. Of the drug tests performed, Defendants only documented the drug test results in the medical records of about half of those instances, which records were often inconsistent and incomplete because they failed to state the test results, explain why the patient was compliant (or non-compliant), and/or state whether any illicit substances were discovered.  (*See* Exhibit 1, Exam & Re-exam Treatment Summary.)

87.    For the small percentage of patients for whom the Doctors ordered drug tests, the drug test results were not used to guide treatment. Many of the patients tested positive for non-prescribed drugs and/or tested negative for their prescribed drugs (indicating the patient may be misusing or diverting the opioids), yet the Doctors failed to report the test results in the medical

records, failed to employ the safeguards listed above, and continued prescribing opioids without interruption in furtherance of their scheme and conspiracy:

(a)    Patient S.M. (Claim No. 08-9J60-452) treated with Dr. Cary and physician assistant Margaret Love at the Cary Practice for 11 visits. On the sixth visit, a drug test in the file shows the patient tested positive for a non-prescribed opioid, Tramadol, as well as two non-prescribed benzodiazepines, Alprazolam and Alpha-hydroxyalprazolam. On the following visit, Margaret Love failed to mention the positive test results in the daily chart note and no other precautions were taken. Thereafter, Dr. Cary and Ms. Love continued prescribing the patient oxycodone (Percocet) for several months. On the eleventh visit, a drug test in the file revealed the patient tested positive for four non-prescribed drugs, PCP, Fentanyl, Alprazolam and Alpha-hydroxyalprazolam. The patient did not return and was never discharged; however, the next month, on October 17, 2017, the patient met with a new pain management doctor. The new doctor's treatment and notes were remarkably more detailed and included the safeguards listed above. On the first date of service, the doctor required the patient to sign a pain management contract, checked the Prescription Monitoring Program (and reported the results), and performed a routine drug test. The doctor noted that the patient was "only interested in medication," was "at **VERY HIGH** risk for addiction, abuse, or other aberrant behaviors based on risk assessment and behavior at new patient education," was "**insistent that I prescribe her narcotics**," but that "[n]o medications were prescribed today: will wait for UDS [urine drug screen] from the lab." (emphasis in original). The patient did not return to this provider for treatment. On January 19, 2018, the patient appeared at a third pain management doctor. On the initial patient visit, the doctor did not prescribe any narcotics and immediately performed a urine drug test (and subsequently performed several additional drug tests). On June 4, 2018 the practitioner noted the patient "takes more then [sic] she is supposed to take and runs out faster then [sic] she should," that the "[p]atient admitted to dealing Cocaine," and tested positive for cocaine and morphine. The patient

was counseled that her drug test results were "a violation of her pain management contract," and thus, the patient was weaned from her Percocet immediately, "counseled on the proper use of narcotic medication, about possible addiction and withdrawal," provided with treatment program options, and discharged from care. Dr. Cary's and Ms. Love's medical records did not include any indications of such potential flags for misuse and they did not employ the same level of safeguards immediately employed by the other two pain management doctors. (*See* Patient S.M. Records, Exhibit 5.)

(b)    Patient J.A. (Claim No. 08-836D-005) treated with Dr. Atkins and Dr. Cary at Delaware Diagnostic and the Cary Practice for 13 visits. On the ninth visit, a drug test shows the patient tested negative for his prescribed oxycodone (Percocet), indicating the patient may be misusing or diverting his medication. On the next visit, Dr. Cary recommends a repeat drug test to rule out a false positive; however, no follow up drug tests are ever performed. Notwithstanding, the patient continues to receive Percocet prescriptions from Delaware Diagnostic for the duration of his treatment. (*See* Patient J.A. Records, Exhibit 6)

(c)    Patient A.H. (Claim No. 08-0628-2G1) treated with Dr. Cary, Dr. King, and Ms. Love for at least 18 visits at the Cary Practice and the King Practice. On January 25, 2017, during the initial evaluation, Dr. Cary noted the patient was already treating and already on Percocet from a prior an auto accident that occurred in November of 2016. On the sixth visit (June 14, 2017), a drug test revealed the patient did not have Percocet in his system—indicating the patient may be misusing or diverting the opioids.[10] Nonetheless, Dr. Cary continues to prescribe the patient Percocet. On the twelfth visit (November 27, 2017), the patient purportedly had a drug test, but the results are not reflected in the chart notes for the following visit (December 28, 2017) and the patient's opioid medical was

---

[10] This drug test was not submitted to the State Farm Plaintiffs; however, the chart note from the seventh visit (July 12, 2017) states the patient "will undergo a repeat random drug test screening to make sure the last test was not a false negative"—indicating the patient did not have Percocet in his system.

refilled. On the fourteenth visit (January 25, 2018), the chart note states "[w]e will need another urine drug test screen from him to rule out a false negative"—again indicating the patient did not have Percocet in his system and may be misusing or diverting the opioids. Nonetheless, Ms. Love refills the patients Percocet. On the fifteenth visit (February 22, 2018), the chart note states "[w]e will need a repeat urine drug test screen to rule out a false negative"—again indicating the patient did not have Percocet in his system and may be misusing or diverting the opioids. Nonetheless, Ms. Love refills the patients Percocet. A drug test in the records dated February 22, 2018 reveals the patient did not have Percocet (oxycodone) in his system, but instead had a non-prescribed opioid, Hydrocodone, in this urine. On the sixteenth visit (March 26, 2018), the chart note reflects another inconsistent drug test result, but nonetheless Dr. Cary continues to prescribe the patient Percocet without interruption. On the eighteenth visit (May 21, 2018), Dr. Cary not only prescribes the patient a "refill of the Percocet," but also gives the patient "a postdated prescription for June 18" (the next month) so that the patient can skip his next appointment but still get his Percocet. A September 22, 2018 drug test reveals the patient again did not have Percocet in his system. (*See* Patient A.H. Records, Exhibit 7.)

(d)     Patient L.P. (Claim No. 08-0099-5C6) treated with Dr. Cary for 13 visits at the King Practice. On November 21 2016, during the initial evaluation, Dr. Cary noted the patient treated with him earlier in 2016 at the Cary Practice for unknown injuries. On the fifth visit (March 15, 2017), the patient underwent a drug screen which showed the patient tested positive for a non-prescribed drug, PCP, and did not have any oxycodone (Percocet) in her system—indicating the patient may be misusing or diverting the opioids. On the sixth visit (April 12, 2017), there is no mention of the failed drug test and Dr. Cary continues to prescribe the patient Percocet. (*See* Patient L.P. Records, Exhibit 8.)

88.     Defendants' intentional refusal to properly use urine drug tests to determine

whether their patients needed opioid medication to reduce actual pain or whether their patients were misusing, abusing, or diverting their opioid medication evidences the Doctors were not interested in providing legitimate medically necessary treatment, but rather were interested in increasing their profits at the expense of their patients. In addition, Defendants' omission of material facts, such as the results of a failed drug test, was a material misrepresentation to the State Farm Plaintiffs.

89.    Defendants' failure to employ these standard practices not only exposed their patients to risk, but is demonstrative of their intent to tailor their treatment protocol to obtain insurance benefits rather than promote their patients' recovery.

C.    *Medical Histories*

90.    The Doctors omitted pertinent medical history information from their initial examination reports and medical records in an effort to conceal the information and induce the State Farm Plaintiffs to pay for the unreasonable and medically unnecessary treatment:

(a)    Patient J.B. (Claim No. 08-0617-N26) is a 64 year-old male who presented at the emergency department following an auto accident. On July 8, 2017, the emergency department noted a medical history of an anxiety disorder, depression, back pain, drug addiction, shortness of breath, sleep apnea, and that the patient was a former heroin addict. At discharge, the emergency department provided the patient with a prescription for a several day supply of Tylenol (no opioids). Five days later, on July 13, 2017, the patient presented at the Cary Practice where Dr. Cary notes the patient's only medical history is hypertension and anxiety and indicates the patient is currently taking Lorazepam, Ambien, and olanzapine (as well as five other drugs). It is unclear who prescribed these drugs and Dr. Cary does not appear to inquire. Dr. Cary fails to mention the patient's medical history of anxiety, depression, drug addiction, shortness of breath, sleep apnea or that the patient is a former <u>heroin</u> user. Given the patient's medical history, the patient is at high risk of opioid misuse, abuse, or addiction and would not be a candidate for opioid therapy, especially given that the patient had not previously

attempted non-opioid therapies. Notwithstanding, Dr. Cary prescribes the patient oxycodone (Endocet) on his initial visit without performing any of the safeguards identified above and without discussing the patient's crucial medical history. Indeed, on August 15, 2017, Dr. Cary noted the patient began taking the oxycodone (Endocet) "three times a day as opposed to twice a day." Instead of documenting the unsanctioned opioid escalation as an aberrant drug related behavior, Dr. Cary refills the patient's oxycodone (Endocet) and increases the frequency to three times daily. In addition, the patient also presented with an elevated risk of opioid overdose given his medical history of sleep apnea, shortness of breath, and concurrent use of a benzodiazepine (Lorazepam). None of this is documented in Dr. Cary's notes. (*See* Patient J.B. Records, Exhibit 9.)

(b)    Patient J.A (Claim No. 08-836D-005) is a 44 year-old male who presented at the emergency department following an auto accident. The following day, the patient treated at Delaware Diagnostic where Dr. Atkins performed an evaluation. The patient purportedly complained of severe neck and low back pain, as well as radiating pain from his neck to his right upper extremity and from his low back to his right lower extremity. Dr. Atkins noted the patient "was struck by another vehicle"—without any further details of the incident.  Dr. Atkins also noted the patient had a prior 2008 motor vehicle accident for which the patient purportedly had no residual issues. For unknown reasons, two days later the patient presented at the Cary Practice for an initial evaluation where the patient purportedly complained of neck, upper back, and low back pain, as well as radiating pain from his neck to the right upper extremity and from the low back to the right and left lower extremities. Dr. Cary noted the patient was in a prior 2006 motor vehicle accident. The inconsistencies between the two medical histories taken by Dr. Atkins and Dr. Cary just two days apart reveals the patient records were not reliable and did not accurately reflect the patient's medical history. (See Patient J.A. Records, Exhibit 10.)

91.    It is unclear how many other patients' medical histories are missing or inaccurate; however, this information is within the possession of the Defendants.

92.     Even in the few instances where the Doctors included some form of a medical history, the medical history information was simply ignored and the predetermined treatment was performed. For example, patient J.J. (Claim No. 08-0306-4B2) presented at the Cary Practice on January 17, 2017 for treatment following a motor vehicle accident in November of 2016. Dr. Cary immediately prescribed the patient Percocet and Cyclobenzaprine without first attempting any non-opioid treatments. On February 14, 2017 and March 16, 2017, the patient had two follow-up examinations with Dr. Cary where he "refills" her drugs. On April 13, 2017, during the patient's fourth visit, Dr. Cary noted the patient was six months pregnant with twins and that the patient has been pregnant for the entire duration of her treatment at the Cary Practice. Notwithstanding, Dr. Cary continued to prescribe her Percocet without any mention of the side effects or risks of taking opioids while pregnant or any attempt to switch to non-opioid treatment. On May 9, 2017, the patient reports being almost 7 months pregnant and Dr. Cary, again, prescribes Percocet without discussing the risk factors or offering any other non-opioid options. (*See* Patient J.J. Records, Exhibit 11.)

93.     The Doctors' intentional failure to obtain a complete medical history and/or their intentional omission of medical history information that would, in legitimate treatment settings, preclude opioid treatment (i.e., the patient is at high risk for opioid misuse, addiction, or abuse) was a material misrepresentation to the State Farm Plaintiffs intended to induce the State Farm Plaintiffs into paying for medically unnecessary treatment.

D.     *Physical Therapy Treatments*

94.     As part of the scheme, the Doctors prescribed, and the Clinics provided, physical therapy treatments consisting of passive modalities for the first two to three months the State Farm Insureds treated with Defendants.

95.      For patients who have been in automobile accidents and who have complaints of pain, a detailed history and legitimate physical examination must be performed to arrive at a legitimate diagnosis and individualized treatment plan for each patient based on his or her specific medical condition and needs.  In a legitimate treating setting, an initial evaluation is

27

performed to aid the physical therapist in assessing and crafting an individualized treatment plan for the patient. During the course of treatment, treatment plans should be modified based upon the unique circumstances of each patient and his or her response (or lack thereof) to the treatment. Ultimately, patients should receive a final evaluation detailing the status of the patient's condition at the conclusion of the physical therapy treatment and be discharged from treatment.

96.     Legitimate treatment plans for patients with soft tissue injuries, strains, and sprains may involve no treatment at all because many of these kinds of injuries heal without any medical intervention, or they may involve a variety of interventions including medications to reduce inflammation and relieve pain, passive physical therapy modalities, and active physical therapy modalities.

97.     Passive physical therapy modalities do not require any affirmative effort or movement by patients. There are many kinds of passive modalities including hot and cold packs, ultrasound, traction, manual therapy, therapeutic massage, and electrical stimulation.

98.     Active physical therapy modalities require patients to affirmatively participate in their treatment and include various kinds of stretching and strengthening exercises.

99.     In legitimate treatment plans following an accident, passive modalities typically are used only to the extent necessary to reduce pain and to facilitate the patient's ability to perform active modalities, which should be introduced into a patient's treatment plan as soon as practicable.

100.    Here, nearly every State Farm Insured received a sprain/strain diagnosis that was used to substantiate the purported need for passive physical therapy—regardless of the severity of the patient's auto accident. (*See* Exhibit 2, Treatment Summary.)

101.    While one or more passive modalities may be appropriate on any particular visit to reduce pain and facilitate the patient's ability to perform active modalities, a combination of only passive modalities on nearly every visit regardless of whether the patient improved would

rarely be appropriate for one such patient, let alone for almost every patient being treated on the vast majority of visits.

102.    There was little documentation of patients performing any exercises, which are the primary intervention for nearly all musculoskeletal injuries. The uniform lack of exercise across the patient population is alarming because the exclusion of exercise tends to make patients dependent on care and actually contributes to their transition to a chronic status. To the extent exercises were mentioned, at all, in the physical therapy notes, there was generally no indication as to the type of exercise performed, how long the patient purportedly performed the exercise, the patient's response (or lack thereof) to the treatment, or whether the person assisting the patient with the exercise was a licensed physical therapist. *See* Sample Physical Therapy Notes, attached as Exhibit 12.[11] This again evidences the physical therapy was not performed to advance the patients' care, and thus, was not medically necessary. Rather, the "physical therapy" was prescribed and performed to advance the conspiracy and substantially deplete or exhaust the patients' no fault benefits.

103.    Combined, the Defendants billed State Farm for more than 3300 physical therapy visits for the State Farm Insureds who received physical therapy.  (*See* Physical Therapy Treatment Summary, Exhibit 13.)  Each patient received, on average, almost 15 physical therapy visits.  (*Id.*)

104.    Approximately 84% of the physical therapy visits did not involve a single active modality.  (*See* Physical Therapy Treatment Summary, Exhibit 13.)  Further, 169 patients never received an active modality throughout their entire course of treatment.   As discussed above, passive modalities should yield to active modalities as treatment continues and a patient's condition improves.  Therefore, the fact that active modalities were not introduced into treatment for the majority of patients suggests the "physical therapy" was not being provided as a medical

---

[11] Although it appears non-licensed person were performing the physical therapy modalities, to the extent the Doctors and Clinics referred any of their patients to in-house physical therapists, this would be in violation of 24 Del. C. § 2616 (a) (8) which bars a physician-owned practice or group practice from referring their own patients to an in-house physical therapist.

necessity, but rather was being performed as a way to generate additional billings to the State Farm Plaintiffs..

105.    The physical therapy treatments were not designed to help the patients' injuries heal and were not medically necessary, but rather, were prescribed and performed pursuant to the predetermined treatment plan—regardless of each patients' individualized needs or complaints—as a way to maximize revenue for Defendants with minimal work.

106.    The complete lack of individualized care and the prescription of medically unnecessary treatment is evidenced in patient W.R. (Claim No. 08-7X35-663) who began treating on March 10, 2016 for complaints of neck, back and shoulder pain. In the initial evaluation, Dr. Cary prescribes physical therapy treatment three times a week for the patient's shoulder. Thereafter, the patient repeatedly complains of shoulder pain. Notwithstanding the patient's continued complaints of shoulder pain, there is no indication in the physical therapy records the patient ever received physical therapy on her shoulder during her 12 months of treatment at the Cary Practice. Instead, the patient received the standard predetermined physical therapy used for all patients.

### Fraudulent & Misleading Nature of the Treatment and Bills

107.    As described above, the Doctors each performed the same uniform treatment for patients across multiple Clinics spanning several years. In addition, the treatment provided by physician assistant Margaret Love, who treated at the Cary Practice and the King Practice, followed the same protocol. Regardless of who performed the treatment, it looked remarkably similar because Dr. Atkins, Dr. Cary, and Dr. King collectively created the scheme and directed others to implement the scheme for their personal financial benefit.

108.    The non-credible patterns documented across all patients' records – that only become apparent after examining and comparing patient records spanning several years – do not reflect legitimate examinations or medically necessary services, but rather a predetermined protocol designed to exploit patients' insurance benefits rather than treat any condition.

109.    Defendants' records represented that they legitimately examined each patient and the records document that patients expressed similar complaints, were prescribed an opioid on the first date of service, required the same passive physical therapy treatment, and required prolonged treatment for their injuries. It is not credible that the patients insured by the State Farm Plaintiffs who sought treatment at three different Clinics, with four different treating providers, over a three year period would have required remarkably similar treatment, including potentially addictive opioids and passive physical therapy. In a typical patient population, one would expect significant variability due to the unique circumstances of each patient and the circumstances of the motor vehicle accident.

110.    Even in instances when a patient did not receive an opioid or was not prescribed passive modality physical therapy, the fact that Defendants may have deviated from the predetermined treatment plan does not mean the patient received individualized care. For example, in some instances the patient simply declined the opioid prescription despite Defendants' desire to prescribe an opioid in conformance with the scheme. In other instances, the patient was already receiving treatment from another provider and did not need duplicative physical therapy at the Clinics.

111.    Ultimately, the Defendants did not legitimately treat any of the at-issue patients based on their unique needs and circumstances. Rather, Defendants exploited these patients as a means to fraudulently obtain payments from the State Farm Plaintiffs through the submission of fraudulent and misleading bills and records. Defendants intentionally created the false and misleading bills and records to justify the medically unnecessary treatment.

112.    The exhibits to this Complaint identify the specific claims, for which the State Farm Plaintiffs believe are wholly (not partially) fraudulent and misleading. Each bill and each medical record that Defendants submitted to the State Farm Plaintiffs contained materially false representations and/or omissions. Defendants knew of the falsity of the bills and records because they collectively hatched a plan to uniformly treat their patients to maximize their revenue. Defendants hoped the State Farm Plaintiffs would pay their bills and anticipated the State Farm

Plaintiffs would not discover the misrepresentations or falsity of the bills and records due to the way the State Farm Plaintiffs are required to adjust claims, and in fact, the State Farm Plaintiffs did not discover the falsity when it individually adjusted and paid the at-issue bills.

113.    Defendants' predetermined treatment plan resulted in the provision of services that were not medically necessary according to the regulations and standards of care outlined above.

### State Farm's Reliance and Damages

114.    Defendants are obligated legally and ethically to act honestly and with integrity. The Delaware medical practice statute governs the conduct of medical and osteopathic doctors. Violations of the statute can result in disciplinary action against the doctor or prosecution by the attorney general.  Under the statute, unprofessional conduct expressly includes:

(a)    The use of any false, fraudulent, or forged statement or document or the use of any fraudulent, deceitful, dishonest, or unethical practice . . . in connection with the practice of medicine;

(b)    Any dishonorable, unethical, or other conduct likely to deceive, defraud, or harm the public;

(c)    The use, distribution, or issuance of a prescription for a dangerous or narcotic drug, other than for therapeutic or diagnostic purposes.

Del. Code tit. 24, § 1731(b).

115.    Further, the Delaware Administrative Code explains that dishonorable, unethical, or conduct likely to deceive, defraud, or harm the public includes:

(a)    "A pattern of performance of unnecessary medical procedures";

(b)    "Fraudulent billing for medical services"; and

(c)    "Failure to comply with the Board's regulations governing the use of controlled substances for the treatment of pain."

24 Del. Admin. Code §§ 1700.8.1.1, 1700.8.1.4, and 1700.8.1.12.

116.    Despite their duty to act honestly, by submitting the bills and supporting documentation, the Doctors each represented that they actually provided the services billed and that the services were reasonable, related to the auto accident, and medically necessary. The Doctors and the Clinics then submitted each of the bills to the State Farm Plaintiffs to induce the State Farm Plaintiffs to pay.

117.    However, Defendants' bills and supporting documentation were false, misleading, and fraudulent because they did not reflect actual treatments that were reasonable or medically necessary and in some instances omitted material information to induce the State Farm Plaintiffs into paying for unreasonable and medically unnecessary treatment. As a result of Defendants' false statements and omissions in the bills and supporting medical records they submitted to the State Farm Plaintiffs, the State Farm Plaintiffs paid for medically unnecessary services. The services were part of Defendants' predetermined treatment plan created by the Doctors and employed at each of the Clinics aimed at maximizing the financial benefit to Defendants without regard to the patients' individual needs.

118.    State Farm Mutual and State Farm Fire are under statutory and contractual obligations to promptly process claims within 30 days of receipt of a written request for payment of a claim for benefits. *See* Del. Code tit. 21, § 2118B(c). Defendants' scheme was successful because of precisely how the State Farm Plaintiffs are required to adjust no-fault claims. The State Farm Plaintiffs must adjust each claim on its individual merits and within the 30-day time constraint outlined by Delaware law.

119.    Defendants developed and implemented the fraudulent scheme to take advantage of the State Farm Plaintiffs, knowing that the efficient operation of a system of insurance requires prompt processing of individual claims, and thus, Defendants' scheme would go undetected unless claims, medical records, and bills were viewed in detail, reviewed collectively across the patient population, and compared to the records of the other Doctors.

120.    The State Farm Plaintiffs relied on the accuracy of the Defendants' statements and representations in the medical bills that the treatment rendered was reasonable, related to the auto accident, and medically necessary.

121.    The State Farm Plaintiffs did not compare the medical bills and records from one claim to another or from one provider to another. Indeed, the time constraints imposed by Delaware law do not allow for any meaningful comparison. Instead, the State Farm Plaintiffs have a right to rely on, and did rely on, Defendants representations that the treatment provided was reasonable, related to the auto accident, and medically necessary.

122.    The bills and supporting documents that the Doctors and Clinics submitted directly to State Farm Mutual and State Farm Fire in support of the fraudulent charges at issue were designed to, and did, cause State Farm Mutual and State Farm Fire to justifiably and reasonably rely on them in processing payment for Defendants' services.

123.    As a result, State Farm Mutual incurred damages of more than $525,000 and State Farm Fire incurred damages of more than $575,000 based upon Defendants' fraudulent charges for services rendered from January 1, 2016 through the present.

124.    Based on Defendants' intentional misrepresentations and omissions to State Farm Mutual and State Farm Fire, State Farm Mutual and State Farm Fire did not discover and should not have reasonably discovered that their payments to Defendants were based on fraud until they reviewed the patterns reflected in the bills and supporting documentation Defendants submitted to State Farm Mutual and State Farm Fire which revealed the Defendants' improper opioid prescribing practices and medically unnecessary prescription of physical therapy.

125.    Defendants fraudulently concealed their conduct by repeatedly submitting misleading bills and medical records that made it appear they were delivering legitimate medical care when considered in the context of a single patient's claim.  In many instances the individual medical records and bills appeared to be legitimate because, as described above, Defendants took steps to evade detection making it difficult to recognize the fraud. Defendants diagnosed patients with purported injuries, intentionally omitted relevant medical history information from their

evaluations, and failed to record drug test results and results from their review of the Prescription Monitoring Program so as not to alert the State Farm Plaintiffs.

126.    Moreover, the lack of appropriate safeguards, such as the lack of pill counts and drug tests, only becomes apparent and meaningful when reviewed over a large population of claim files. One patient not having a pill count or a drug test, in and of itself, may not be indicative of fraud. In addition, one purportedly "false positive" drug test could actually be a false positive, or at least not be fraud. However, when a single pill count is not documented during more than 2,000 patient examinations and re-examinations and there are dozens of failed drug tests that are disregarded, the lack of safeguards becomes startling. Only when the patterns in the lack of safeguards across all claims are analyzed does the fraud perpetrated by the Defendants become apparent.

127.    It was not until the State Farm Plaintiffs reviewed the bills and patient records over an extended period of time and began comparing the medical records and bills of the Doctors with: (1) one another; (2) between multiple patients; and (3) between the Clinics, did the wrongful conduct become apparent and did the State Farm Plaintiffs began to suspect the individual claims were fraudulent and misleading. Only then did it become apparent that Defendants were not providing legitimate medical care designed to address their patients' actual injuries from auto accidents.  Instead, they were indiscriminately prescribing opioid narcotics and physical therapy to the vast majority of patients who treated at the Clinics.   The submission of misleading bills and medical records were affirmative acts by Defendants that prevented State Farm from discovering the truth.

128.    State Farm Mutual's and State Farm Fire's injuries were inherently unknowable because State Farm Mutual and State Farm Fire believed they were paying what they owed. They processed and paid Defendants' fraudulent claims in the normal course of business and did not suspect, and had no reason to suspect, that Defendants were engaged in a fraudulent scheme designed to improperly and unlawfully extract insurance benefits from State Farm Mutual and State Farm Fire.

## FIRST CLAIM FOR RELIEF
### (Common Law Fraud Against All Defendants)

129.    State Farm Mutual and State Farm Fire incorporate, as if fully set forth herein, each and every allegation in paragraphs 1 through 128.

130.    Defendants Delaware Diagnostic, the Cary Practice, the King Practice, Dr. Atkins, Dr. Cary, and Dr. King intentionally and knowingly made false and misleading statements of material fact to State Farm Mutual and State Farm Fire by submitting, or causing to be submitted, bills and supporting documentation that contained false representations concerning patients treated at Delaware Diagnostic, the Cary Practice, and the King Practice by Drs. Atkins, Cary, and King.

131.    The false and misleading representations of material fact include representations that:

(a)    Patients were legitimately examined to determine the true nature and extent of their injuries, when they were not;

(b)    Patients were legitimately diagnosed with, among other things, sprains and strains of the cervical, thoracic, and/or lumbar regions of the spine, when they were not;

(c)    Patients were prescribed and received physical therapy treatments that were medically necessary, when in the fact the treatment was performed based on the predetermined treatment protocol and not based on an individualized assessment and evaluation of patients' medical needs;

(d)    Patients were prescribed and received opioid pain medications that were medically necessary, when in fact the medications were provided based on the predetermined treatment protocol as an inducement for patients to continue treating with Defendants;

(e)    Patients received numerous follow-up examinations that were medically necessary, when in fact the examinations were provided based on the predetermined

treatment protocol and not based on an individualized assessment and evaluation of patients' medical needs.

132.    Dr. Atkins, Dr. Cary, Dr. King, Delaware Diagnostic, the Cary Practice, and the King Practice each knew the representations described in the paragraph above were false and misleading at the time they were made.  Defendants knew the treatments they provided were not medically necessary and that they were not legitimately evaluating, diagnosing, and treating the State Farm Insureds.

133.    Defendants' false and misleading statements of material fact include the representations in each claim identified Exhibits 14, 15, and 16.

134.    Dr. Atkins, Dr. Cary, Dr. King, Delaware Diagnostic, the Cary Practice, and the King Practice each made the misrepresentations described above and engaged in such conduct to induce State Farm Mutual and State Farm to rely on the misrepresentations and pay their bills for services rendered to State Farm Insureds.

135.    State Farm Mutual and State Farm Fire relied on Defendants' misrepresentations when they paid Defendants' bills.

136.    State Farm Mutual's and State Farm Fire's reliance was justifiable and reasonable because they did not know or have reason to know that Defendants' representations were false.

137.    As a result of its reliance, State Farm Mutual incurred damages of more than $525,000.  State Farm Mutual paid the following amounts to each of the Clinics based on its reliance:

> (a)    Delaware Diagnostic:  more than $210,000 (*see* Exhibit 14);

> (b)    Cary Practice:  more than $195,000 (*see* Exhibit 15); and

> (c)    King Practice:  more than $120,000 (*see* Exhibit 16).

138.    As a result of its reliance, State Farm Fire incurred damages of more than $575,000.  State Farm Fire paid the following amounts to each of the Clinics based on its reliance:

> (a)    Delaware Diagnostic:  more than $177,000 (*see* Exhibit 14);

      (b)     Cary Practice:  more than $272,000 (*see* Exhibit 15); and

      (c)     King Practice: more than $124,000 (*see* Exhibit 16).

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Dr. Atkins, Dr. Cary, Dr. King, Delaware Diagnostic, Atkins Practice, Cary Practice, and King Practice for compensatory damages, costs, and any other relief the Court deems just and appropriate.

### SECOND CLAIM FOR RELIEF
### (Civil Conspiracy Against All Defendants)

139.    State Farm Mutual and State Farm Fire incorporate paragraphs 1 through 128 as if fully set forth herein.

140.    Each Defendant – Dr. Atkins, Dr. Cary, Dr. King, Delaware Diagnostic, the Cary Practice, and the King Practice – knowingly agreed and conspired with one another and with each separate Clinic to conduct and participate directly  in the scheme when they submitted or caused to be submitted claims that were fraudulent and unlawful (as described above in paragraphs 1 through 128).  In furtherance of the scheme, the Doctors acted outside the scope of their employment at their respective Clinics and engaged in conspiratorial conduct to further their own personal purposes and not those of the Clinics. The Doctors were not legitimately and individually treating patients, but rather conspired to employ a uniform treatment plan for all patients so they could personally profit from the exaggerated billings to the State Farm Plaintiffs.

141.    As detailed above, Dr. Atkins, Dr. Cary, Dr. King, Delaware Diagnostic, the Cary Practice, and the King Practice each agreed to act and did act in furtherance of the common and overall objective of the conspiracy to fraudulently obtain no-fault insurance benefits by submitting and facilitating the submission of bills and supporting documentation that made intentional misrepresentations that the examinations, diagnoses, services, and medications were medically necessary and were lawful when they were not for the claim numbers identified in

Exhibits 14, 15, and 16. Accordingly, the Defendants are jointly and severally liable to State Farm Mutual and State Farm Fire for the damages caused by the Defendants' conspiracy.

142.    State Farm Mutual has been injured in its business and property by reason of Defendants' conduct in that it paid more than $525,000 based upon the fraudulent submission of bills and supporting documentation.

143.    State Farm Fire has been injured in its business and property by reason of Defendants' conduct in that it paid more than $575,000 based upon the fraudulent submission of bills and supporting documentation.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Defendants for compensatory damages plus interest, and any other relief the Court deems just and proper.

### THIRD CLAIM FOR RELIEF
**(Unjust Enrichment Against the Clinics)**

144.    State Farm Mutual and State Farm Fire incorporate, as if fully set forth herein, each and every allegation in paragraphs 1 through 128.

145.    There is no contract between State Farm Mutual and any of Defendants that governs State Farm Mutual's payment of no-fault insurance benefits to Defendants.

146.    There is no contract between State Farm Fire and any of Defendants that governs State Farm Fire's payment of no-fault insurance benefits to Defendants.

147.    State Farm Mutual and State Farm Fire have been impoverished by the payment of insurance benefits by State Farm Mutual and State Farm Fire to the Clinics. The Clinics were enriched by State Farm Mutual's and State Farm Fire's payments.

148.    There is a direct relationship between State Farm Mutual and State Farm Fire and the Clinics. The Clinics billed for the services purportedly provided by the Doctors and other Clinic personnel to the State Farm Insureds, billed State Farm Mutual and State Farm Fire for those services, and State Farm Mutual and State Farm Fire paid the Clinics for those services.

149.    There is no justification for Defendants' conduct or their retention of State Farm Mutual's and State Farm Fire's payments to them.  As described herein, Defendants engaged in an intentional and fraudulent scheme to obtain insurance benefits from State Farm Mutual and State Farm Fire.  Instead of treating each State Farm Insured based on his or her individual needs, Defendants engaged in a predetermined treatment protocol that involved prescribing large quantities of opioid pain relievers, requiring patients to complete a compulsory round of passive physical therapy at the outset of treatment, directing patients to return for follow-up examinations every month, and using the opioid prescriptions as an inducement to ensure that patients continued treating with Defendants.  Rather than employing necessary and adequate safeguards in connection with prescribing dangerous and highly addictive opioid pain medications, Defendants largely neglected to use even the most basic safeguards such as checking the Delaware Prescription Monitoring Program, utilizing treatment agreements, performing pill counts, and requiring periodic urine drug testing.  Defendants' conduct not only defrauded State Farm Mutual and State Farm Fire, but depleted State Farm Insureds' no-fault insurance benefits for unnecessary services and, worst of all, endangered State Farm Insureds' health.

150.    State Farm Mutual and State Farm Fire plead unjust enrichment in the alternative to their fraud claim.  If State Farm Mutual and State Farm Fire are unsuccessful on that claim, then State Farm Mutual and State Farm Fire will have no remedy at law for Defendants' wrongful conduct.

151.    State Farm Mutual and State Farm Fire seek restitution of their payments to Clinics for services rendered from January 1, 2016 through the present, as set forth in Exhibits 14, 15, and 16.

WHEREFORE, State Farm Mutual and State Farm Fire demand judgment against Defendants for restitution, costs, and any other relief the Court deems just and proper.

## FOURTH CLAIM FOR RELIEF

### (Declaratory Relief Pursuant to 28 U.S.C. § 2201 Against the Clinics)

152.    State Farm Mutual and State Farm Fire incorporates, as if fully set forth herein, each and every allegation in paragraphs 1 through 128.

153.    There is an actual controversy between State Farm Mutual and State Farm Fire, on the one hand, and the Clinics, on the other hand, as to State Farm Mutual's and State Farm Fire's obligation to pay the Clinics' unpaid bills (whether in whole or in part) for services that the Clinics already billed to State Farm Insureds, but for which the State Farm Plaintiffs have not yet paid. The claims subject to the declaratory judgement count and the unpaid amounts are identified in Exhibits 14, 15, and 16.

154.    As described herein, Defendants engaged in an intentional and fraudulent scheme to obtain insurance benefits from State Farm Mutual and State Farm Fire.  Instead of treating each State Farm Insured based on his or her individual needs, Defendants engaged in a predetermined treatment protocol that involved prescribing large quantities of opioid pain relievers to most patients, requiring patients to complete a compulsory round of physical therapy at the outset of treatment, and directing patients to return for follow-up examinations every month and using the opioid prescriptions as an inducement to ensure that patients continue treating with Defendants.   Rather than employing necessary and adequate safeguards in connection with prescribing dangerous and highly addictive opioid pain medications, Defendants largely neglected to use even the most basic safeguards such as checking the Delaware Prescription Monitoring Program, utilizing treatment agreements, performing pill counts, and requiring periodic urine drug testing.   Defendants' conduct not only defrauded State Farm Mutual and State Farm Fire, but depleted State Farm Insureds' no-fault insurance benefits for unnecessary services and, worst of all, endangered State Farm Insureds' health.

155.    As a result of Defendants' fraudulent and unlawful conduct, State Farm Mutual and State Farm Fire do not owe the Clinics payment for any unpaid bills.

156.    Because Defendants provided services to State Farm Insureds that were not medically necessary, State Farm Mutual and State Farm Fire do not owe the Clinics any payment for any unpaid bills.

157.    Accordingly, State Farm Mutual and State Farm Fire seek a declaration that they do not owe the Clinics for any unpaid bills, which claims and unpaid amounts are identified in Exhibits 14, 15, and 16.

WHEREFORE, State Farm Mutual and State Farm Fire demand a declaratory judgment against the Clinics: (a) declaring that State Farm Mutual and State Farm Fire are not obligated to pay any unpaid bills for services that Defendants provided from January 1, 2016 through the present; (b) declaring that State Farm Insureds are not obligated to pay any unpaid bills for services that Defendants provided from January 1, 2016 through the present; and (c) granting such other and further relief this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), State Farm Mutual and State Farm Fire demand a trial by jury of all issues so triable.

Dated: March 04, 2019                    **MCCARTER & ENGLISH LLP**

                                         _/s/ Andrew S. Dupre_
                                         Andrew S. Dupre (#4621)
                                         Alexandra M. Joyce (#6423)
                                         Renaissance Centre
                                         405 N. King Street, 8th Floor
                                         Wilmington, Delaware 19801
                                         T: (302) 984-6328
                                         F: (302) 984-0311
                                         adupre@mccarter.com
                                         ajoyce@mccarter.com

                                         -and-

                                         **HOLLAND & KNIGHT LLP**
                                         David I. Spector (admitted _pro hac vice_)
                                         Adam K. Hodges (admitted _pro hac vice_)
                                         Kayla Pragid (admitted _pro hac vice_)

42

222 Lakeview Avenue, Suite 1000
West Palm Beach, Florida 33401
T: (561) 833-2000
F: (561) 650-8399
David.Spector@hklaw.com
Adam.Hodges@hklaw.com
Kayla.Pragid@hklaw.com

*Attorneys for Plaintiffs State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company*